# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
STARLETTA PARTEE,
Defendant and Appellant.

S248520

Second Appellate District, Division Five
B276040

Los Angeles County Superior Court
TA138027

January 23, 2020

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Groban concurred.

PEOPLE v. PARTEE

S248520


Opinion of the Court by Liu, J.


After voluntarily speaking with law enforcement in the course of a murder investigation, defendant Starletta Partee declined to testify against four suspects in the ensuing prosecution, notwithstanding the compulsion of a subpoena and a grant of use immunity. The district attorney then prosecuted Partee for her failure to testify. A jury convicted Partee of four felony counts of accessory after the fact to murder under Penal Code section 32 and one misdemeanor count of contempt of court under Penal Code section 166, subdivision (a)(6). The trial court sentenced Partee to 365 days in county jail, otherwise suspended the imposition of sentence, and placed her on probation for three years. The Court of Appeal affirmed.

Partee argues that her failure to testify does not support an accessory conviction because her silence does not fulfill the "overt or affirmative assistance" requirement of the crime of accessory. We agree. Because Partee's convictions for accessory were predicated on her failure to testify, we reverse the judgment of the Court of Appeal as to those convictions.

## I.

On August 31, 2006, when Partee was 21 years old, she reported a rental car stolen. The rental company directed her to file a claim with the Hawthorne Police Department. Partee did so. When she arrived at the Hawthorne police station, detectives from the Los Angeles Police Department met her and

1

drove her to the office of homicide detective John Skaggs. The Los Angeles police had found the car abandoned in a housing complex, with bullet indents in the body and a bullet casing caught between the hood and windshield. The police believed the vehicle was connected to a murder that occurred the night before.

Detective Skaggs conducted an interview with Partee, which he surreptitiously recorded. In the course of the interview, he told Partee, "[Y]ou're obligated to be completely truthful, even if it hurts. . . . If you're caught lying in some way, I would associate you directly with the murder. . . . If you lie to me, this much, I will associate you to the commission of that crime, okay." He also said, "What is said in he[re] is between you and I. . . . Let's get that straight now." At the close of the interview, Detective Skaggs stated, "You said, 'All this was off the record.' Okay. And I told you, 'Yes.' My question is, and it's not going to happen, but if the District Attorney or somebody said, 'I need you to come and tell your story to court,' how would you feel?" Partee replied that she would not testify because "that's my family, you help them." She added that although she would not think that her family posed a threat or danger if she were to testify, she would be "uncomfortable" because she lived in a neighborhood with a strong gang presence.

Partee's statements to Detective Skaggs implicated her brother Nehemiah Robinson, her cousin Toyrion Green, and her friends Bryant and Byron Clark in the murder. Partee told Detective Skaggs that Robinson had borrowed the rental car the night before. Robinson had told her that he wanted the car to go see his girlfriend. At midnight, Robinson called Partee and said he was going to park the car elsewhere before returning home because he did not want their mother to know that he had

taken the vehicle. The next morning, Robinson still had not returned home; Partee thought he was trying to avoid their mother because he had not helped with cleaning the house the night before. Bryant or Byron Clark then called Partee and asked her to pick them up. Partee drove to meet them, and Robinson, Green, and the Clarks got out of another woman's car and got into hers. As Partee later told Detective Skaggs, the four began recounting to her what had happened the previous evening. They told her that they thought they had been set up after going to meet a girl who was going to give them money and that they "had to get out and start shooting" because "[t]hey tried to block us in and shoot us up." Partee said Robinson, who was in the front seat and "just had his head down the whole time," also said, "I think the guy is dead."

Despite Detective Skaggs's representation to Partee that "it's not going to happen," the district attorney did in fact subpoena Partee to testify against Robinson, Green, and the Clarks after they were charged with murder. But Partee did not appear at their 2008 trial. After Partee could not be found, the charges against the four were dismissed. In April 2015, law enforcement located Partee. She was subpoenaed and held in custody as a material witness. The district attorney reinitiated prosecution of the murder case, and at the June 2015 preliminary hearing in the revived case, the prosecutor informed the court that he intended to grant Partee use immunity. Partee's counsel told the court that he had told his client that the grant of immunity meant she could not rely on the Fifth Amendment to avoid testifying. Partee still declined to testify. She remained silent when the court tried to swear her in, and she did not answer the prosecutor's questions. The court held Partee in contempt, stating, "You are going to be put in

custody with no bail until such time as you change your mind." The murder charges were subsequently dismissed a second time. The court held Partee in custody as a material witness for seven and a half months.

The district attorney then charged Partee with four felony counts of accessory after the fact to murder and one misdemeanor count of contempt. To each count, the district attorney added a gang enhancement allegation pursuant to Penal Code section 186.22. (All statutory references are to the Penal Code unless otherwise noted.) The prosecution was predicated on Partee's failure to testify at the 2015 preliminary hearing.

At trial, Partee took the stand and explained her reasons for not testifying in the murder case. The year before, Partee had experienced retaliation for working with prosecutors as a witness after the murder of her boyfriend. Shortly after that murder, Partee's car was set on fire; when asked whether that was "a very traumatic experience," Partee said, "Yes." She was also shunned by members of her community and endured an attempted attack at a store. Partee testified that after she had spoken to Detective Skaggs about the underlying murder in this case, a woman encountered her at a show and told her that she had heard that Partee "was snitching on the homies." The woman told Partee, "You know, I ride for them. I'll kill for them." The woman also said she would "do something to [Partee] for that. I'll ride for mine."

In addition to fearing for her own and her daughter's safety, Partee said that she did not want to alienate her family, and she did not want the accused, who were family or like family to her, to go to prison for the rest of their lives due to her

testimony. Relocation was not a viable option, Partee said, because she was caring for her deceased cousin's seven children and two of her deceased boyfriend's children. Moreover, relocation would require uprooting her daughter from her high school honors program. As Partee explained, "[I]t's impossible to escape your entire family to pick up and leave."

The jury convicted Partee on the four felony counts of accessory after the fact to murder and one misdemeanor count of contempt, but found the gang allegations not true. The court suspended imposition of sentence on the condition that Partee serve 365 days in county jail, with credit for time served, and three years on probation. At sentencing, the trial court said, "[T]hroughout the trial, I think there was some sort of assertion that but for Ms. Partee, the four gentlemen who were accused of killing [the victim] might have been convicted. [¶] Now, I've been in this particular business 45 years. . . . [I]t just seems to the court to assert that had it not been for Partee's testimony there would have been a conviction, seems to me to be conjecture, speculation and maybe guesswork."

The Court of Appeal affirmed. (*People v. Partee* (2018) 21 Cal.App.5th 630 (*Partee*).) "[D]espite being held in custody as a material witness and offered immunity and relocation," the court explained, "defendant's refusal to testify was motivated in part by the desire to ensure that her brother, cousin, and lifelong friends were not convicted and incarcerated. As a result, four accused murderers avoided trial and possible conviction. The prosecution, having tried in vain to compel defendant's testimony, and no doubt desiring to discourage similar behavior by other witnesses, particularly in gang-related cases, resorted to the present prosecution. We find no legal authority precluding it." (*Id.* at p. 638.) The court went on to say,

"Defendant did much more than simply commit contempt by refusing to testify. The jury found she refused to testify with the specific intent to help four accused murderers avoid trial, conviction, and punishment. The intent with which defendant acted distinguishes her level of culpability from that of a simple contempt." (*Ibid.*) While acknowledging that accessory liability requires conduct amounting to " ' "overt or affirmative assistance to a known felon" ' " (*id.* at p. 639), the court said that "[u]nder these circumstances, defendant's 'silence' was an overt or affirmative act falling within the terms of section 32 because she had a duty to testify at [the June 2015] preliminary hearing" (*id.* at p. 640).

Justice Baker dissented from this holding. (*Partee*, *supra*, 21 Cal.App.5th at p. 642 (conc. & dis. opn. of Baker, J.).) He observed that "[n]o California case has ever sanctioned use of Penal Code section 32 . . . to mete out felony punishment for a witness who merely opts to remain silent (as distinguished from a witness who affirmatively tells some falsehood in a police interview or while on the witness stand to throw the police or the jury off track). Indeed, . . . I have discovered no court in any jurisdiction *nationwide* that has ever sanctioned this sort of an accessory after the fact prosecution." (*Ibid.*) "[I]f this is an 'affirmative act' case," he reasoned, "the majority leaves few that would not be; every possibly recalcitrant witness will get a subpoena, and every such witness, according to the majority, will therefore have a duty to testify and be an accessory to the related felony when refusing, so long as there is proof of the requisite knowledge and intent." (*Id.* at p. 651 (conc. & dis. opn. of Baker, J.); see *id.* at p. 652 (conc. & dis. opn. of Baker, J.) ["If today's decision stands, accessory charges for recalcitrant witnesses are now fair game."].)

6

We granted review.

## II.

Refusing to testify in the face of a subpoena, absent a valid reason, is a misdemeanor offense under the statute punishing contempt of court. (§ 166, subd. (a)(6).) The parties do not dispute that Partee was properly convicted of contempt under section 166 for refusing to testify at the June 2015 preliminary hearing in the murder case against Robinson, Green, and the Clarks. The question is whether Partee may be additionally punished as an accessory after the fact to murder, a felony under section 32.

Section 32 provides: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." Construing this statute, we have explained that " '[t]he crime of accessory consists of the following elements: (1) someone other than the accused, that is, a principal, must have committed a specific, completed felony; (2) the accused must have harbored, concealed, or aided the principal; (3) with knowledge that the principal committed the felony or has been charged or convicted of the felony; and (4) with the intent that the principal avoid or escape from arrest, trial, conviction, or punishment.' " (*People v. Nuckles* (2013) 56 Cal.4th 601, 607 (*Nuckles*), italics omitted.) The first, third, and fourth elements are not at issue here; there is no dispute that Partee possessed the knowledge and intent required by section 32 when she refused to testify. This case concerns only the second element:

whether Partee, by refusing to testify despite the subpoena, "harbor[ed], conceal[ed,] or aid[ed]" the principals charged with murder. (§ 32.) More precisely, the Attorney General does not contend that Partee "harbor[ed]" or "conceal[ed]" the principals; the question is whether Partee "aid[ed]" the principals within the meaning of the statute. (*Ibid.*)

In interpreting the terms "harbors, conceals or aids" in section 32, we note that the statute, as originally enacted in 1872, stated: "All persons who, after full knowledge that a felony has been committed, conceal it from the magistrate, or harbor and protect the person charged with or convicted thereof, are accessories." (1872 Pen. Code, § 32.) The statute was "a codification of the common-law rule" of accessory after the fact (*Ex parte Goldman*, Civ. 199, Supreme Ct. Mins., Mar. 7, 1906) and criminalized only affirmative conduct (see *People v. Garnett* (1900) 129 Cal. 364, 366 ["Mere silence after knowledge of [a felony's] commission is not sufficient to constitute the party an access[o]ry."]). The Legislature in 1935 amended the statute to its current form, adding the term "aids" alongside the terms "harbors" and "conceals," and adding the requirement of intent that the principal avoid or escape arrest, trial, conviction, or punishment. (Stats. 1935, ch. 436, § 1, p. 1484.) We agree with the Attorney General that it is reasonable to infer that the Legislature's addition of the term "aids" was intended to expand the scope of prohibited conduct to cover forms of assistance to a principal beyond harboring or concealing. But we do not agree that the term "aids" plainly covers Partee's conduct here.

We begin with the text, "giving it a plain and commonsense meaning . . . . in the context of the statutory framework as a whole." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.) The word

"aids," in isolation, could be read to cover not only overt action that provides assistance to a principal, but also passive conduct. When the word "aid" was added to section 32 in 1935, it was commonly understood to mean "[t]o further the interests or designs of (another) by assistance or cooperation; to give support, help, or succor to; assist." (Webster's 2d New Internat. Dict. (1935) p. 53.) It is possible for a person to give help, support, or assistance to another by affirmatively acting or by refraining from acting.

But section 32 does not exist in a vacuum. A neighboring provision, section 31, defines the offense of aiding and abetting a crime: "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." Sections 31 and 32 are derived from sections 11 and 12 respectively of the Statutes of 1850, which predated the Penal Code. (Stats. 1850, ch. 99, §§ 11–12, p. 230.) Section 11 defined an "accessory" as one "who stands by and aids, abets, or assists; or who not being present aiding, abetting, or assisting, hath advised and encouraged the perpetration of the crime. He or she who thus aids, abets or assists, advises or encourages, shall be deemed and considered as principal, and punished accordingly." Section 12 defined an "accessory after the fact" as one who "conceals" a crime or "harbors and protects" the perpetrator "after full knowledge that a crime has been committed."

In 1872, these two provisions were enacted as part of the Penal Code in the same title, which defines penalties for various "[p]arties to [c]rime." (1872 Pen. Code, § 32.) In 1935, the Legislature further aligned sections 31 and 32 by amending section 32 to its current form, adding the term "aids" alongside

the terms "harbors" and "conceals." (Stats. 1935, ch. 436, § 1, p. 1484.) Thus, "[s]ection 31 and section 32 are interrelated in that they are both constituent elements of a single legislative scheme — that portion of the Penal Code which defines the status of various parties to crime (tit. 2, pt. 1, of the Pen. Code, 'Parties to Crime')." (*People v. Elliott* (1993) 14 Cal.App.4th 1633, 1641, fn. 7 (*Elliott*).)

"One of the fundamental rules of statutory construction is that interrelated statutory provisions should be harmonized and that, to that end, the same word or phrase should be given the same meaning within the interrelated provisions of the law." (*Elliott*, *supra*, 14 Cal.App.4th at p. 1641, fn. 7.) With respect to section 31, "[i]t is well settled that aiding and abetting the commission of a crime *require[s] some affirmative action*." (*People v. Weber* (1948) 84 Cal.App.2d 126, 130, italics added; accord, *People v. Villa* (1957) 156 Cal.App.2d 128, 134 ["[T]he test is whether the accused in any way, directly or indirectly, aided the perpetrator by acts."]; 1 Witkin, Cal. Criminal Law (4th ed. 2019) Introduction to Crimes, § 100 ["A person cannot be held guilty as a party . . . if he or she . . . did not take any affirmative action when it was committed."].) The word "aids" in section 31 refers only to overt or affirmative forms of assistance.

The word "aids" in section 32 must be read in the same way. Indeed, this court and the Courts of Appeal have held that to aid the perpetrator of a crime after it has been committed, an individual must provide " 'overt or affirmative assistance' " to the perpetrator. (*Nuckles*, *supra*, 56 Cal.4th at p. 610, quoting *People v. Duty* (1969) 269 Cal.App.2d 97, 104 (*Duty*).) In *Nuckles*, we said that "[t]he gist of the [section 32] offense is that the accused ' "harbors, conceals or aids" the principal with the

requisite knowledge and intent.  Any kind of overt or affirmative assistance to a known felon may fall within these terms. . . .  "The test of an accessory after the fact is that, he renders his principal some personal help to elude punishment . . . — the kind of help being unimportant." ' " (*Nuckles*, at p. 610, quoting *Duty*, at p. 104.)  Although many " ' "kind[s] of help" ' " may qualify as harboring, concealing, or aiding a principal under the statute, the Court of Appeal and the parties acknowledge, and we agree, that the help provided must be in the nature of " ' "overt or affirmative assistance." ' " (*Nuckles*, at p. 610.)

Paradigmatic examples of such assistance include disposing of a vehicle that the principal used in committing murder (*People v. Linville* (2018) 27 Cal.App.5th 919, 922) and driving the principal away from the scene of an attempted murder, suggesting that the principal conceal the gun used in the crime, and driving the principal to the site where the principal and the defendant concealed the gun, "any of which alone might constitute the actus reus of" accessory (*People v. Gunn* (1987) 197 Cal.App.3d 408, 415).  On the other hand, evidence that a defendant "*encouraged* [the principal] to run away and that he, thereafter, hid with her" has been held insufficient for an accessory conviction.  (*Elliott, supra*, 14 Cal.App.4th at p. 1642; see *id.* at p. 1642, fn. 9 ["the activities of the accused . . . must amount to overt assistance as opposed to mere incitement or encouragement"].)  These cases have understood the word "aid" to mean " 'to assist, "to supplement the efforts of another." ' " (*People v. Bond* (1910) 13 Cal.App. 175, 185; accord, *People v. Thurman* (1923) 62 Cal.App. 147, 152 (*Thurman*) [the word "aid" means "a contribution of effort supplementing the efforts of another"].)

The question in this case concerns a witness's silence in the face of legal compulsion to provide testimony in a criminal trial. It is not obvious that such silence — a failure to supplement the efforts of the prosecution — amounts to " 'overt or affirmative assistance.' " (*Nuckles*, *supra*, 56 Cal.4th at p. 610.) An examination of case law concerning witness statements as a basis for accessory liability casts significant doubt on the statute's applicability here.

The Court of Appeal discussed three cases — *Duty*, *supra*, 269 Cal.App.2d 97, *In re I.M.* (2005) 125 Cal.App.4th 1195 (*I.M.*), and *People v. Plengsangtip* (2007) 148 Cal.App.4th 825 (*Plengsangtip*) — that, in its view, involved "similar circumstances" and supply "precedent for an accessory conviction under the facts of this case." (*Partee*, *supra*, 21 Cal.App.5th at p. 636.) These cases are not binding on us and, in any event, do not support an accessory conviction based on Partee's conduct. In fact, the case law is consistent that a refusal to give information or speak to authorities does not by itself satisfy the overt or affirmative assistance requirement of the accessory offense.

In *Duty*, *supra*, 269 Cal.App.2d 97, the defendant gave an "inferably false statement" to a city fire marshal investigating an arson: He stated that the principal's car had been in a particular location at the time of the crime, but the prosecution's evidence indicated otherwise. (*Id.* at p. 103.) Upholding a section 32 conviction on these facts, the court observed: "Whether a falsehood to the police or other public investigators may violate the accessory statute is a new question in California. According to some American decisions, the offense is not committed by passive failure to reveal a known felony, by refusal to give information to the authorities, or by a denial of

knowledge motivated by self-interest.  On the other hand, an affirmative falsehood to the public investigator when made with the intent to shield the perpetrator of the crime, may form the aid or concealment denounced by the statute." (*Duty,* at pp. 103–104, fns. omitted [citing out-of-state decisions].)  The court then stated the rule that "[a]ny kind of overt or affirmative assistance" may satisfy the "harbors, conceals or aids" element of section 32 and went on to explain that "[t]he evidence here shows more than passive non-disclosure.  The jury could reasonably find that defendant had actively concealed or aided [the principal] by supplying an affirmative and deliberate falsehood to the public authorities, a false alibi which removed the principal from the scene of her crime and placed her on the highway enroute to San Francisco at the time when the fire must have been set." (*Duty,* at p. 104.)

*I.M.*, *supra*, 125 Cal.App.4th 1195, similarly involved a defendant who made a misleading statement to authorities investigating a murder.  The court cited *Duty* for the proposition that "[a] person may aid, or attempt to aid, the principal to a crime by making false or misleading statements to the authorities, and such conduct will support a conviction of accessory after the fact." (*I.M.*, at p. 1203, citing *Duty*, *supra*, 269 Cal.App.2d at p. 104.)  The *I.M.* court upheld an accessory conviction based on evidence that the defendant "was attempting to protect Victor [the principal] by misrepresenting to the police that Victor began to shoot only after" a friend of the murder victim had acted in a threatening manner, including by "reach[ing] towards his waistband" for a possible weapon. (*I.M.*, at p. 1203; see *id.* at p. 1201 ["The physical evidence was inconsistent with the statements by defendant . . . ."].)  The defendant's misrepresentation "could be viewed as an attempt

to show that Victor shot under heat of passion, or that Victor thought he was acting in self-defense," thereby aiding Victor in avoiding punishment. (*Id.* at p. 1205.)

*Plengsangtip, supra*, 148 Cal.App.4th 825, is also similar. The court there upheld a conviction under section 32 where the defendant told a detective that "he did not see a murder take place nor did he see or hear 'anything unusual' " (*Plengsangtip*, at p. 837) on a particular date in a particular area — statements that a magistrate judge "reasonably concluded" were "an affirmative falsehood" (*id.* at p. 838). The court reviewed *Duty* and *I.M.*, and contrasted those decisions with *People v. Nguyen* (1993) 21 Cal.App.4th 518 (*Nguyen*), which reversed three defendants' convictions for being accessories to a crime of sexual assault where "[t]he evidence showed only that the three defendants were *aware* that their cohorts in the robbery were committing the sexual assault" but "two of the defendants simply refused to talk to the police about the crimes, and the third merely admitted he was present at the scene of the robbery and downplayed his role. . . ." (*Plengsangtip*, at pp. 836–837; see *Nguyen*, at pp. 538–539.) Summarizing the law, the court explained that "a person generally does not have an obligation to volunteer information to police or to speak with police about a crime. If the person speaks, however, he or she may not affirmatively misrepresent facts concerning the crime, with knowledge the principal committed the crime and with the intent that the principal avoid or escape from arrest, trial, conviction, or punishment." (*Plengsangtip*, at p. 837, citing *Duty, supra*, 269 Cal.App.2d at pp. 103–104.) On the facts presented, the court rejected the defendant's contention that "his statements to [the detective] amounted to no more than a failure on his part to report a crime. . . ." (*Plengsangtip*, at

p. 838.) The court instead concluded that "[t]hese statements were affirmative representations of positive facts" comprising "an overt attempt to change the picture of what happened [at the murder scene] and thereby shield [the principal] from prosecution." (*Ibid.*)

Thus, neither *Duty*, *I.M.*, nor *Plengsangtip* provides "precedent for an accessory conviction under the facts of this case." (*Partee, supra*, 21 Cal.App.5th at p. 636.) All three cases upheld accessory convictions on the basis of affirmative and misleading statements made to investigating authorities, whereas Partee's accessory conviction was based on her refusal to make any statement at all during the June 2015 preliminary hearing. We do not decide whether an affirmative misstatement is sufficient to form the basis of an accessory charge. But we agree that "the mere passive failure to reveal a crime, the refusal to give information, or the denial of knowledge motivated by self-interest does not constitute the crime of accessory." (*Plengsangtip, supra*, 148 Cal.App.4th at p. 836.)

Other cases are in accord. (See *Shortridge v. Municipal Court* (1984) 151 Cal.App.3d 611, 620 & fn. 10 (*Shortridge*) [a construction of section 32 that does not "permit adults to 'harbor, conceal or aid' a juvenile who has committed a felony" will not "place parents of wayward children in the dilemma of choosing whether to inform on their children or risk criminal punishment by remaining silent" because "[m]ere passive nondisclosure is not the type of activity which renders one an accessory"]; *People v. Harris* (1980) 105 Cal.App.3d 204, 213 [officer's justified "belief that Ms. Devlin had *knowingly* given [another officer] false information so as to facilitate appellant's escape from arrest" supported probable cause to arrest Ms. Devlin for violating section 32].)

The dissenting justice in the Court of Appeal below found "no court in any jurisdiction *nationwide* that has ever sanctioned this sort of an accessory after the fact prosecution." (*Partee*, *supra*, 21 Cal.App.5th at p. 642 (conc. & dis. opn. of Baker, J.).) Our own research has likewise found no case on point. The Attorney General acknowledges "[t]he absence of specific precedent on this issue" but offers two theories as to why Partee's conduct constitutes overt or affirmative assistance under section 32.

First, like the Court of Appeal, the Attorney General underscores that Partee's conduct was not "a mere failure to report a crime to authorities" but rather a "refus[al] to testify in the face of a legal duty." It is true that the cases above do not address scenarios involving a valid subpoena. And the subpoena here along with the grant of use immunity distinguishes this case from *Nguyen*, where two defendants who refused to talk to the police had no legal duty to do so. (See *Nguyen*, *supra*, 21 Cal.App.4th at p. 539 ["Obviously the exercise of the constitutional right to remain silent cannot be the basis for conviction as an accessory."].)

But the Attorney General does not explain how a legal duty to testify transforms Partee's silence from "merely passive" conduct to "overt or affirmative assistance" under section 32. There is no question that a refusal to comply with a valid subpoena is grounds for criminal liability under the contempt statute, and Partee was duly convicted of contempt. (§ 166, subd. (a)(6) [providing for misdemeanor liability for "[t]he contumacious and unlawful refusal of a person to be sworn as a witness or, when so sworn, the like refusal to answer a material question"]; see *In re McKinney* (1968) 70 Cal.2d 8, 12; *In re Keller* (1975) 49 Cal.App.3d 663, 670–671.) But Partee's defiance of a

subpoena did not alter the essential character of her conduct, which was "the refusal to give information." (*Plengsangtip*, *supra*, 148 Cal.App.4th at p. 836.) Inaction in the face of a legal duty to act is still inaction. Were we to hold otherwise, it is plausible that "every possibly recalcitrant witness will get a subpoena," and felony "accessory charges for recalcitrant witnesses are now fair game." (*Partee*, *supra*, 21 Cal.App.5th at pp. 651, 652 (conc. & dis. opn. of Baker, J.).) This includes "parents of wayward children" who, if served with a valid subpoena, would face "the dilemma of choosing whether to inform on their children or risk criminal punishment by remaining silent." (*Shortridge*, *supra*, 151 Cal.App.3d at p. 620, fn. 10.) It would even mean that crime victims can be convicted as accessories to the very crimes perpetrated against them if they decide not to testify after being subpoenaed and offered immunity. For example, victims of domestic violence could be forced to choose between testifying against an intimate partner or being convicted as accessories to their own assault. Section 32 has never been construed to reach that far.

Further, we note that the law offers protections for certain crime victims that prohibit them from being held in custody for contempt for refusing to testify, but there is no similar exception for an accessory after the fact. (See Code Civ. Proc., § 1219, subd. (b) ["a court shall not imprison or otherwise confine or place in custody the victim of a sexual assault or domestic violence crime for contempt if the contempt consists of refusing to testify concerning that sexual assault or domestic violence crime"].) It would be quite odd if a victim of sexual assault or domestic violence could not be held in custody for contempt for refusing to testify, but could be prosecuted under the same circumstances as an accessory after the fact.

Second, the Attorney General contends that unlike witnesses who "refuse to testify or feign ignorance based on fears of retribution," a recalcitrant witness who disobeys a court order with the intent to help another evade prosecution has rendered overt or affirmative assistance within the ambit of section 32. But this distinction appears illusory because any witness who refuses to give incriminating testimony against a principal — whether out of personal loyalty, fear of retribution, or distrust of the justice system — could reasonably be said to possess a specific intent to help the principal evade punishment. And to the extent that the Attorney General argues that a specific intent to help a principal evade prosecution transforms a witness's silence into overt or affirmative assistance, we reject such a conflation of section 32's mens rea and actus reus requirements. Our precedent makes clear that " 'the intent that the principal avoid or escape from arrest, trial, conviction, or punishment' " (*Nuckles, supra,* 56 Cal.4th at p. 607, italics omitted) is an element of the crime of accessory that is separate and distinct from the requirement of " ' "overt or affirmative assistance" ' " (*id.* at p. 610). Partee's intent that the principals avoid punishment did not transform her silence into overt or affirmative assistance, nor did it transform her misdemeanor offense of contempt into four felony offenses of accessory after the fact to murder.

## CONCLUSION

We hold that a witness's refusal to testify in the face of a valid subpoena, while punishable as contempt, does not by itself amount to harboring, concealing, or aiding a principal within the meaning of section 32. In so holding, we decline to "place[] California on the extreme outer edge of jurisdictions — indeed, in a group unto itself — concerning the reach of accessory after

the fact punishment." (*Partee*, *supra*, 21 Cal.App.5th at p. 651 (conc. & dis. opn. of Baker, J.).)

The crime of contempt is the vehicle that the Legislature has provided " 'to enable the courts to vindicate their authority and maintain the dignity and respect due to them' " when confronted with a recalcitrant witness. (*In re McKinney*, *supra*, 70 Cal.2d at p. 12.) Misdemeanor contempt is punishable by one year in jail and a $1,000 fine. (§ 19.) If the contempt was committed "for the benefit of, at the direction of, or in association with any criminal street gang," as was alleged but not proven in this case, it can be punished as a felony with a sentence of one, two, or three years. (§ 186.22, subd. (d); see also § 1332, subd. (b) [material witness who refuses to appear and testify may be held in custody "until the witness complies or is legally discharged"].) We decline to add to this authority the power to punish a recalcitrant witness as an accessory after the fact.

We reverse the judgment of the Court of Appeal with respect to Partee's four convictions under section 32.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Partee

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 21 Cal.App.5th 630
**Rehearing Granted**

_____

**Opinion No.** S248520
**Date Filed:** January 23, 2020

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Allen J. Webster, Jr.

_____

**Counsel:**

Paul Kleven, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Louis W. Karlin, Scott A. Taryle, Stacy S. Schwartz, Colleen M. Tiedemann and Ilana Herscovitz Reid, Deputy Attorneys General, for Plaintiff and Respondent.

Jackie Lacey, District Attorney (Los Angeles), Phyllis C. Asayama and Kenneth Von Helmolt, Deputy District Attorneys, for Los Angeles County District Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Paul Kleven
Law Office of Paul Kleven
1604 Solano Avenue
Berkeley, CA 94707
(510) 528-7347

Colleen M. Tiedemann
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6599