Filed 5/1/23 P. v. Prater CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C095412 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE010948) |
| v. | |
| JESSICA DIANE PRATER, | |
| Defendant and Appellant. | |

Defendant Jessica Diane Prater, with knowledge that her boyfriend, Adam Caldwell, was severely beating her five-year-old son, Z., failed to take any reasonable steps to prevent the continuation of this abuse. On the day of Z.'s murder, Caldwell tortured the boy by undressing him, placing him in cold bath water, and repeatedly pulling one of his legs up into the air, causing the boy's head to submerge beneath the water line and strike the bottom of the bathtub. Caldwell did so in order to interrogate Z. over certain items he believed the boy took from him and hid somewhere in the house.

1

Defendant was home at the time. Rather than prevent Caldwell from doing this to her son, she participated by asking Z. to tell Caldwell what he wanted to know. The torture went on for at least two hours and resulted in the boy's death.

A jury convicted defendant of one count of first degree murder on the theory that she aided and abetted a murder by torture, one count of assault causing the death of a child, and one count of child abuse likely to produce great bodily injury and resulting in death. The trial court sentenced defendant to an indeterminate state prison term of 25 years to life.

On appeal, defendant contends: (1) the trial court prejudicially erred, violated her federal constitutional rights, and also violated separation of powers principles under the California Constitution, by providing the jury with two instructions informing the jury that defendant could be convicted of aiding and abetting the murder of her son based on her failure to act despite owing a legal duty to take reasonable steps to protect and obtain medical attention for her child; and (2) the matter must be remanded for a new sentencing hearing because defendant is entitled to retroactive application of certain ameliorative changes to the sentencing laws.

We affirm. The jury was properly instructed in accordance with *People v. Rolon* (2008) 160 Cal.App.4th 1206 (*Rolon*), and other Court of Appeal decisions, holding that a parent's knowledge of continuous abuse being inflicted upon his or her child, along with the parent's failure to take reasonable steps to prevent the abuse, can support aider and abettor liability if the nonintervention was intended to facilitate the abuse. (*Id.* at p. 1219; *People v. Ogg* (2013) 219 Cal.App.4th 173, 181; *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 744.) Contrary to defendant's argument on appeal, our Supreme Court's decision in *People v. Partee* (2020) 8 Cal.5th 860 (*Partee*) did not impliedly overrule any of these decisions. There was therefore no instructional error and defendant's constitutional rights were not violated. We also conclude remand for a new

2

sentencing hearing is not required. While recent changes to the sentencing laws apply retroactively to defendant's case, the errors asserted on appeal are harmless.

## FACTS AND HISTORY OF THE PROCEEDINGS

Defendant and Z. moved in with Caldwell about two months before the child's death. Z. was five years old. Defendant also had two older sons, who did not live there. Caldwell had partial custody of three of his own children, a 10-year-old son and two older daughters, who were 12 and 14 years old, respectively.

Caldwell severely beat Z., both with his hands and with various objects, including a leather belt, a switch, and a fire stoker. During defendant's interview at the sheriff's station, she explained that Caldwell did so because Z. "was taking his stuff and hiding it." Defendant said she thought Z. was "just calling out for attention," and that he was hiding Caldwell's belongings because he was jealous of Caldwell and did not want them to be together. Defendant admitted, however, that Z. said he wanted them to leave Caldwell's house "because [Caldwell] spanked him."

These were not mere spankings. They concerned Caldwell's oldest daughter enough for her to tell defendant that she needed to stop her father from beating Z. Photos taken following Z.'s death showed extensive bruising covering the boy's body, confirming the extent of the abuse inflicted upon him by Caldwell during the two months he lived there. Defendant admitted that she saw the bruising on her son's body and that it was not consistent with mere spanking.

Further confirming defendant's knowledge of the abuse, about two weeks before the murder, she sent a text message to a friend saying that Z. was "tougher than [she] thought," adding: "That boy can take a spanking with a real leather belt and not shed one tear." Later that day, defendant messaged the same friend saying: "[Z.] broke a $400 saw thing, lost [Caldwell's] saw blade . . . . I can't afford to pay him for this shit. [Z.] is just going to keep doing these things until it's just me and him again." The next day,

3

defendant sent another message saying: "[Z.] got into [Caldwell's] guns. They were in our closet. I can't believe he did that. [Z.] is fine. They weren't loaded, but it's the fact that he didn't listen. [Caldwell] and [I] have done everything." A subsequent message stated: "[Caldwell] told him not to touch his guns. WTF is wrong with my kid? He has no respect for me or anyone else. I'm done."

The night before the murder, Caldwell beat Z. with the belt for getting into his ammunition, which was located in Caldwell's bedroom. During her interview at the sheriff's station, defendant initially said that she told Caldwell to stop, grabbed Z., and left the house. Defendant claimed she and Z. walked to a school, but then returned to the house after she was unable to get a hold of her mother to pick them up. Later, when one of the detectives told defendant they would be able to pull up security camera footage from the school to see whether this was true, she admitted she did not leave the house with Z. that night.

The abuse continued the next morning. Caldwell began by questioning Z. about the location of items he still believed the boy had taken from him. Not satisfied with Z.'s answers, Caldwell filled the bathtub with cold water, undressed the boy, and put him inside. As defendant described, Caldwell "kept asking him, 'Where's my stuff? Where's my stuff?'" After asking the question, Caldwell would grab one of Z.'s feet and pull his leg up into the air, causing the boy's head to submerge beneath the water line and strike the bottom of the bathtub.

Defendant's account of how long this went on, and her level of participation, changed during her interview. At first, defendant claimed Caldwell did this to her son six times. According to defendant, she immediately "walked over and . . . said, 'Okay. That's enough.'" After further pleading for Caldwell to stop, he eventually did. Defendant then pulled Z. out of the water, dried him off, and put clothes on the boy. Z. was shivering, looked exhausted, and also threw up a lot of water, so defendant wrapped

4

him in a blanket, placed him on a bed, and stayed with him until his lips turned purple. According to this version of events, the entire episode lasted "half an hour."

After some questioning about the timeline, defendant admitted Caldwell had Z. in the bathtub "for a long time." She now estimated it was more like two hours, but instead of being there for the entire episode, defendant claimed she periodically left the bathroom to look for the items Caldwell said were missing. While looking in the garage, defendant had a cigarette. When asked why she did not call 911 while she was in the garage, defendant claimed she was afraid of Caldwell. However, earlier in the interview, she admitted that Caldwell never hit or threatened her, adding that if he had ever done that to her, she "wouldn't be there." This sentiment was an echo of an earlier comment she made when briefly interviewed at the hospital. There, after denying that Caldwell ever engaged in any acts of violence against her, defendant stated: "I don't put up with that."

Defendant also claimed during her interview at the sheriff's station that when she came back into the house after smoking a cigarette in the garage, she told Caldwell to stop. Caldwell eventually relented and walked out of the bathroom, leaving Z. in the cold water. Defendant pulled him out, dressed him, and placed him on the bed. According to defendant, she called 911 about 15 minutes later when she realized he was not breathing.

Later in the interview, defendant admitted she knew Caldwell's conduct could have killed her son, specifically, "his head going underwater." She also admitted that Z. lost consciousness before she put him on the bed and his breathing was "shallow." She then changed her version of events again, claiming she did not wait 15 minutes to call 911, but rather immediately called Caldwell into the room after noticing Z.'s shallow breathing, Caldwell started cardiopulmonary resuscitation (CPR), and defendant called 911. At this point in the interview, after being asked to consent to a search of her cell phone, defendant admitted she spoke with her mother and oldest son on the phone for about 45 minutes while Z. was being tortured in the bathtub. She did not tell them what was happening to Z.

Still later in the interview, defendant admitted using the bathroom while Caldwell was torturing her son in the bathtub, adding: "I just probably had to pee." She further admitted hearing Z.'s head strike the bottom of the tub when Caldwell pulled his leg up to dunk his head below the water line and acknowledged this might have happened as many as 13 times. Defendant finally admitted participating in the interrogation, pulling Z. to the side of the tub at one point and asking: " 'Where's his stuff?' " Z. answered: " 'I don't know.' " When asked whether defendant believed her son in fact took Caldwell's belongings, defendant also answered: "I don't know."

Defendant called 911 at 1:43 p.m., more than two hours after the phone call in the garage. Defendant reported to the emergency dispatcher that Z. "was takin' a bath and he swallowed a buncha water and he's not breathing." Emergency medical personnel arrived within minutes. When they arrived, Z. was on the bedroom floor with Caldwell over him performing CPR. Z. was not breathing and did not have a pulse. Paramedics loaded him onto a gurney and rushed him to the ambulance, performing CPR and other potentially lifesaving procedures on the way. Z. was pronounced dead shortly after his arrival at the hospital. The cause of death was determined to be water inhalation and blunt force injuries. Water inhalation was the main cause of death. However, as the forensic pathologist explained, the extensive bruising covering Z.'s body also contributed to his death by lowering the volume of blood available to carry oxygen to his organs.

Caldwell drove defendant to the hospital but did not come inside. As mentioned, defendant was briefly questioned at the hospital. She claimed during this initial interview that she was the one who gave Z. a bath that day. She then sent Caldwell a text message saying: "I told them I was giving him a bath." Caldwell responded: "Thanks." Defendant then begged Caldwell to join her at the hospital. Caldwell did not do so.

DISCUSSION

I

*Claimed Instructional Error*

Defendant contends the trial court prejudicially erred, violated her federal constitutional rights, and violated separation of powers principles under the California Constitution, by providing the jury with two instructions the parties agree would have informed the jury that defendant could be convicted of aiding and abetting the murder of her son based on her failure to act despite owing a legal duty to take reasonable steps to protect and obtain medical attention for her child. She did not object to these instructions at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 . . . ." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) We conclude there was no error, much less a miscarriage of justice.

A.      The Challenged Instructions

At the request of the prosecution, and without objection, the trial court instructed the jury with the following instruction, titled, "Special Instruction # 1 – Parental Duty to Act":

"The word 'act' as used in these instructions includes an omission or failure to act in those situations where a person is under a legal duty to act.

"A parent has a legal duty to his or her minor child to take all steps reasonably necessary under the circumstances in a given situation to exercise reasonable care for the child, to protect the child from harm, and to obtain reasonable medical attention for the child.

7

"The parent, however, need not risk death or great bodily harm in doing so, and the relative size and strength of the parties involved is relevant to a determination of what is reasonable.

"If you conclude that defendant . . . owed a duty to [Z.] and defendant . . . . . . failed to perform that duty, her failure to act is the same as doing an injurious act."

The trial court also modified the standard murder instruction, CALCRIM No. 520, to add the words "or failed to do a required act" and "or failure to act" throughout the instruction. For example, the beginning of the modified instruction provided:

"The defendant is charged in Count 1 with murder in violation of Penal Code section 187. To prove that the defendant is guilty of this crime, the People must prove that:

"1.    The defendant committed an act *or failed to do a required act* that caused the death of another person;

"AND

"2.    When the defendant acted *or failed to do a required act*, she had a state of mind called malice aforethought." (Italics added.)

The modified instruction then defined express and implied malice, similarly, adding the words "or failed to do a required act" to the definition of implied malice.

Finally, the modified instruction continued in relevant part:

"When it is shown that a killing resulted from the intentional doing of an act *or intentional failure to act* with implied malice, no other mental state need be shown to establish the mental state of implied malice aforethought.

"When the killing is the direct result of such an act *or failure to act*, it is not necessary to prove that the defendant intended that the act *or failure to act* would result in the death of a human being. [¶] . . . [¶]

8

"An act *or failure to act* causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act." (Italics added.)

B. Analysis

The challenged special instruction and modifications to CALCRIM No. 520 are based primarily on *Rolon*, *supra*, 160 Cal.App.4th 1206, in which our colleagues at the Second Appellate District held "a parent has a duty to protect his or her young child and may be criminally culpable on an aider and abettor theory for an [assaultive offense] where the parent fails to take reasonably necessary steps for the child's protection, so long as the parent, with ability to do so, fails to take those steps with the intent of facilitating the perpetrator's assaultive offense." (*Id*. at p. 1209.) There, as here, the defendant's boyfriend committed the affirmative abusive conduct that resulted in the death of her young child. The defendant was convicted on an aiding and abetting theory of second degree murder, assault on a child resulting in death, and willfully causing a child to suffer under circumstances likely to result in death. (*Id*. at pp. 1211-1212.)

As here, the trial court instructed the defendant's jury that she "had a duty to take all steps reasonably necessary under the circumstances to protect [her child] from harm," and further modified other instructions "to the effect that [the defendant's] failure to perform her duty would be the equivalent of an affirmative act for the purposes of finding aiding and abetting, implied malice and second degree murder." (*Rolon*, *supra*, 160 Cal.App.4th at p. 1212.) The appellate court concluded these instructions correctly stated the law.

In so concluding, the *Rolon* court began by citing *People v. Heitzman* (1994) 9 Cal.4th 189 (*Heitzman*) for the " 'well established' " proposition that criminal liability may not be based on the failure to act unless the defendant had " 'an existing legal duty to take positive action.' " (*Rolon*, *supra*, 160 Cal.App.4th at p. 1212, quoting *Heitzman*, at

9

p. 197.) Such a legal duty may arise from the common law. For example, in *Heitzman*, our Supreme Court held section 368, which criminalizes both causing and permitting abuse of an elder or dependent adult, to be constitutional so long as the statute's imposition of criminal liability for *permitting* such abuse is read "to apply only to a person who, under existing tort principles, has a duty to control the conduct of the individual who is directly causing or inflicting abuse on the elder or dependent adult." (*Heitzman*, at p. 194; hereafter, statutory section citations are found in the Penal Code unless otherwise stated.) The *Heitzman* court explained that "[w]hen a criminal statute does not set forth a legal duty to act by its express terms, liability for a failure to act must be premised on the existence of a duty found elsewhere," such as "another criminal or civil statute" or "a common law duty based on the legal relationship between the defendant and the victim, *such as that imposed on parents to care for and protect their minor children*." (*Id.* at p. 198, italics added; see also *People v. Ogg*, *supra*, 219 Cal.App.4th at p. 176 ["A parent has an exceptional and unique relationship with his or her children; this principle needs no citation"].)

The *Rolon* court also relied on *People v. Swanson-Birabent*, *supra*, 114 Cal.App.4th 733, in which the appellate court held that a mother could be tried for aiding and abetting her boyfriend in committing two counts of lewd or lascivious conduct against her daughter based on her " 'act' " of "standing over the bed and watching as [the boyfriend] molested the victim." (*Id.* at p. 744.) After rejecting the defendant's argument that doing so amounted to " '[m]ere presence at the scene of a crime[,]' " the court stated: "Our analysis would be the same even if we were to classify defendant's act of standing over the bed, watching [her boyfriend] molest the victim, as an 'omission' rather than an 'act.' Although no published California case has yet to consider the question, other 'state courts have held that a failure to act can constitute aiding and abetting, provided the aider and abettor has a legal duty to act. [Citations.]' [Citation.]" (*Ibid.*)

10

Finally, the *Rolon* court discussed various out-of-state decisions supporting the conclusion that although aiding and abetting liability generally requires affirmative conduct, "there is an exception where the common law imposes an affirmative duty to act." (*Rolon*, *supra*, 160 Cal.App.4th at pp. 1216-1217, discussing *State v. Walden* (N.C. 1982) 293 S.E.2d 780, 784; see also *People v. Stanciel* (Ill. 1992) 606 N.E.2d 1201, 1211; *State v. Edgar* (Kan. 2006) 127 P.3d 1016, 1023-1024.)

Acknowledging that a minority of states had decided the issue the other way, the *Rolon* court concluded "the better rule is that parents have a common law duty to protect their children and may be held criminally liable for failing to do so[.]" (*Rolon*, at p. 1219.) Thus, "a parent who knowingly fails to take reasonable steps to stop an attack on his or her child may be criminally liable for the attack if the purpose of nonintervention is to aid and abet the attack." (*Ibid*.; see also *People v. Ogg*, *supra*, 219 Cal.App.4th at p. 181 [following *Rolon* and concluding the defendant "knew the full extent of [her boyfriend's] criminal purpose and, by her inaction, intended to facilitate his sexual abuse" of her daughter].)

Defendant does not argue the challenged instructions misstated the law as set forth in *Rolon*. Instead, she argues our Supreme Court's recent decision in *Partee*, *supra*, 8 Cal.5th 860 "effectively overrules *Rolon*" by "requiring affirmative conduct even where there is a legal duty to act" in order to support aiding and abetting liability. We disagree.

In *Partee*, our Supreme Court held the defendant's refusal to testify in a murder case did not support her convictions for being an accessory after the fact to murder. (*Partee*, *supra*, 8 Cal.5th at p. 863.)

Among other elements, conviction of this crime requires proof that the defendant "harbor[ed], conceal[ed,] or aid[ed] a principal" who committed a felony. (§ 32.) The defendant's convictions were based on the theory that her refusal to testify against the principals charged with murder " 'aid[ed]' the principals within the meaning of the statute." (*Partee*, at p. 867.) Concluding this was insufficient, the court first explained

11

that the original version of section 32 codified the common law and required affirmative concealment or harboring. However, in 1935, the Legislature amended the statute to add "the term 'aids' alongside the terms 'harbors' and 'conceals[.]' " (*Ibid.*) Acknowledging that the plain meaning of the word " 'aid' " includes "giv[ing] help, support, or assistance to another by affirmatively acting or by refraining from acting," the court explained that "section 32 does not exist in a vacuum" and must be read together with section 31, defining aiding and abetting, because these sections " 'are interrelated in that they are both constituent elements of a single legislative scheme – that portion of the Penal Code which defines the status of various parties to crime [citation].' [Citation.]" (*Id.* at pp. 867-868.) The court then said the following about section 31: " '[I]t is well settled that aiding and abetting the commission of a crime *require[s] some affirmative action.*' [Citations.] The word 'aids' in section 31 refers only to overt or affirmative forms of assistance." (*Id.* at p. 868.) The court then concluded "[t]he word 'aids' in section 32 must be read in the same way." (*Ibid.*)

We cannot conclude our Supreme Court intended to overrule *Rolon*, *supra*, 160 Cal.App.4th 1206, *People v. Ogg*, *supra*, 219 Cal.App.4th 173, and *People v. Swanson-Birabent*, *supra*, 114 Cal.App.4th 733, merely by quoting the general rule that liability for aiding and abetting requires affirmative conduct and concluding the accessory after the fact statute should be read the same way. Indeed, *Rolon* itself acknowledges this is the general rule. (*Rolon*, at pp. 1216-1217.) And while the word "only" in the sentence, "[t]he word 'aids' in section 31 refers *only* to overt or affirmative forms of assistance" (*Partee*, *supra*, 8 Cal.5th at p. 868, italics added), does suggest there is no exception to the general rule, the cases cited by our Supreme Court immediately before making that broad and general statement do not purport to hold no exceptions exist. (See *People v. Weber* (1948) 84 Cal.App.2d 126) [reversing 20-year-old defendant's convictions for contributing to the delinquency of minors where he failed to prevent them from using his parents' barn as a location for drinking and sexual

12

intercourse]; see also *People v. Villa* (1957) 156 Cal.App.2d 128.) Indeed, the *Weber* court noted "there was no 'duty' on the part of defendant to take any action whatever, *in the circumstances*" of that case (*Weber*, at p. 130, italics added), suggesting that other circumstances, in which a duty to act was owed, might have resulted in a different outcome.

As we have explained, *Rolon* held there is an exception to the general rule that aiding and abetting the commission of a crime requires affirmative action, specifically where a parent, owing a common law duty to protect his or her child, fails to take reasonable steps to do so. (*Rolon*, *supra*, 160 Cal.App.4th at p. 1209.) That specific issue was not at issue in *Partee*. Nor was it at issue in the cases cited in *Partee* before the court stated that "aids" refers only to overt or affirmative conduct. "It is elementary that the language used in any opinion is to be understood in the light of the facts and the issue then before the court." (*McDowell and Craig v. City of Santa Fe Springs* (1960) 54 Cal.2d 33, 38.)

As stated by the United States Supreme Court over two centuries ago: "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." (*Cohens v. State of Virginia* (1821) 19 U.S. 264, 399-400.)

We follow *Rolon* in concluding the jury in this case was properly instructed. For this reason, we must also reject defendant's assertion that her federal constitutional rights were violated. (*People v. Avila* (2006) 38 Cal.4th 491, 596 ["find[ing] no instructional error, defendant's claim of federal constitutional error must fail"].)

13

Finally, the challenged instructions did not violate separation of powers principles under the California Constitution by premising criminal liability on the common law rather than legislative enactment or voter initiative. A similar argument was also raised and rejected in *Rolon*: "Appellant argues that while, under *Heitzman*, the common law may inform the scope and nature of a statutorily established duty to act, it does not permit criminal liability to flow from the common law where no statute imposes liability. Appellant misreads *Heitzman*. That case does not say that the common law may only inform an existing statutory duty; it says that a criminal statute may embody a common law duty. [Citation.] As an example, *Heitzman* cites *People v. Burden* (1977) 72 Cal.App.3d 603, . . . in which a father who willfully withheld food from his child, resulting in the child starving to death, was liable for murder based on his failure to perform his common law duty to care for his child. [Citation.] To recognize that a criminal statute may embody a common law duty to act, as *Heitzman* does, is not to impose criminal liability without a statute. The statute is still the source of liability; the common law only provides the rationale that failure to act can be equivalent to an affirmative act in some situations." (*Rolon*, *supra*, 160 Cal.App.4th at pp. 1215-1216.) We agree entirely with this analysis.

In sum, we conclude defendant's jury was properly instructed and there was no constitutional violation.

II

*Retroactive Application of Recent Changes to the Sentencing Laws*

Defendant also claims entitlement to retroactive application of certain ameliorative changes in the sentencing laws. The Attorney General concedes the new laws apply retroactively to defendant's case, but argues we may nevertheless affirm the judgment because the errors are harmless and any remand would be futile. We agree with the Attorney General.

A.    Defendant's Sentencing

At the sentencing hearing, before sentencing defendant, the trial court provided the following assessment of what the evidence established at trial:

"So you move in with Mr. Caldwell. You've only been with him a short period of time. And over the course of those weeks, you sit by and you watch Mr. Caldwell inflict severe, physical and emotional abuse on your little boy. You watched him emotionally torment him, beat him, belt him, whip him. There's some indication that you even went out and got an oleander branch for him to whip him.

"This is not discipline. This is not spanking. This is not anything close to the realm of reasonable discipline. This is vicious, repeated, severe abuse of a little five-year-old, your son. He depended on you. You were all he had in this world. He loved you. You were supposed to protect him, to look out for him.

"Mr. Caldwell didn't love [Z.] But you were supposed to protect [Z.] And you stood by and watched, if not assisted, while Mr. Caldwell brutalized, heartlessly, viciously hit a little boy. What happened in that bathtub was not a bath. And it was not discipline. He was beat, he is submerged in water. He was drowned. He was murdered. You murdered your little boy, just as much as Mr. Caldwell did.

"And after, after you kill him, you and Mr. Caldwell, your concern – you are more concerned about protecting Mr. Caldwell and yourself. And just so you know, I don't believe any of it. Any of this information about how [Z.] was a bad boy or a lying boy or someone who stole.

"All of that, it comes from you and Mr. Caldwell, and I don't believe a word that either of you says. It's all self-serving. It's all self-serving. [Z.] was a little boy. He deserved to live. He'd be ten years old now."

The trial court then sentenced defendant to state prison for 25 years to life for first degree murder (§ 190, subd. (a)), a concurrent term of 25 years to life for assault causing

15

the death of a child (§ 273ab, subd. (a)), and a concurrent determinate term of 10 years for child abuse likely to produce great bodily injury and resulting in death (§ 273a, subd. (a) [upper term of six years for the offense]; § 12022.95 [four-year enhancement for the resulting death].) The trial court stayed the latter two terms of imprisonment under section 654.

### B. Analysis

Defendant claims entitlement to retroactive application of Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518) (Stats. 2021, ch. 441, § 1) and Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) (Stats. 2021, ch. 731, § 1.3). While defendant also claims entitlement to retroactive application of Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 695), we note that Senate Bill 567 was enacted after Assembly Bill No. 124 and incorporated Assembly Bill No. 124's amendments to section 1170. (Stats. 2021, ch. 731, § 3, subd. (c).) Senate Bill 567 takes precedence because it was enacted last. (Gov. Code, § 9605.) We therefore address defendant's latter contention as raised under Senate Bill 567.

Beginning with Assembly Bill 518, at the time defendant was sentenced, section 654 required an act or omission punishable in different ways by different laws to be punished under the law that provided for the longest possible term of imprisonment. Effective January 1, 2022, Assembly Bill 518 amended this provision to afford trial courts with discretion to punish the act or omission under any of the applicable laws. (§ 654; Stats. 2021, ch. 441, § 1.)

Turning to Senate Bill 567, also effective January 1, 2022, this enactment amended section 1170 to limit the trial court's ability to impose an upper term determinate sentence by making the middle term the presumptive prison term unless specified circumstances exist. (§ 1170, subd. (b)(1)-(2); Stats. 2021, ch. 731, § 1.3.) A trial court "may impose a sentence exceeding the middle term only when there are

16

circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, *and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial*." (§ 1170, subd. (b)(2), italics added; Stats. 2021, ch. 731, § 1.3.) Section 1170 was also amended to add subdivision (b)(6), which creates a presumption in favor of the lower prison term if "[t]he person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence," and this "was a contributing factor in the commission of the offense." (§ 1170, subd. (b)(6)(A); Stats. 2021, ch. 731, § 1.3.)

As the Attorney General concedes, these ameliorative changes in the sentencing laws apply retroactively in this case. (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109 (*Zabelle*); *People v. Sek* (2022) 74 Cal.App.5th 657, 673; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

However, with respect to the change to section 654 made by Assembly Bill 518, the Attorney General argues remand is not required because the trial court's statements at the sentencing hearing make clear it would not have exercised its new discretion to punish defendant for count three rather than count one. We agree.

A trial court must exercise "informed discretion" when sentencing a defendant. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) Where the trial court proceeds as though it does not have discretion (as it did in this case because, at the time of sentencing, it had no discretion to impose a lesser sentence), "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Ibid.*) We are satisfied that the comments made by the trial court before imposing a term of 25 years to life for murder clearly indicate that the trial court would not have stayed this sentence in favor of imposing an unstayed determinate term of 10 years for count three.

Turning to the changes made by Senate Bill 567, the Attorney General concedes "the trial court did not rely on aggravating facts either admitted by [defendant] or found to be true beyond a reasonable doubt" when it imposed the upper term sentence on count three, but argues the error was harmless. We again agree.

In this regard, we first note that the trial court did not explicitly cite any aggravating circumstances in support of imposing the upper term. However, the statements made by the trial court, set forth above, reveal that three aggravating circumstances were necessarily found to be true before the court imposed defendant's sentence, including the upper term for count three. In making these statements, the trial court necessarily found "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness," "[t]he victim was particularly vulnerable," and "[t]he defendant took advantage of a position of trust or confidence to commit the offense." (Cal. Rules of Court, rule 4.421(a)(1), (3), (11).)

As we explained in *Zabelle*, *supra*, 80 Cal.App.5th 1098, "when a trial court, inconsistent with [section 1170's] current requirements, imposes an upper term sentence based on its own factfinding, . . . the trial court has found a fact that exposes a defendant to a greater potential sentence," and thereby "violate[s] defendant's rights under the Sixth Amendment." (*Id*. at p. 1111.) Thus, in order to conclude this constitutional violation was harmless, we must be able to " 'conclude[], beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true *at least a single aggravating circumstance* had it been submitted to the jury . . . .' " (*Ibid*., quoting *People v. Sandoval* (2007) 41 Cal.4th 825, 839, italics added.) We so conclude with respect to each of the three aggravating circumstances noted above. There can be no doubt that the crime involved great violence, great bodily harm, and a high degree of cruelty, viciousness, and callousness. Nor can there be any doubt that the victim, a five-year-old boy, was particularly vulnerable, or that defendant, his mother,

18

took advantage of a position of trust when she, at the very least, declined to take reasonable steps to protect him from the torture that ended his life. We conclude the Sixth Amendment error was manifestly harmless.

The foregoing also resolves the remaining state law level of harmless error review. Returning to *Zabelle*, *supra*, 80 Cal.App.5th 1098, we explained that merely concluding the Sixth Amendment violation was harmless does not necessarily end the inquiry. This is "because even if we find the jury would have found true at least one of the aggravating circumstances that the trial court relied on, we still must grapple with the trial court's reliance on other aggravating circumstances inconsistent with the current requirements of section 1170." (*Id*. at p. 1112.) Thus, in addition to concluding that "the trial court *could* have imposed the upper term sentence" in accordance with the Sixth Amendment, in order "to find harmless error for the state law error, we must find that the trial [court] *would* have imposed the upper term sentence even absent the error. In particular, we must consider whether it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error." (*Ibid*.) Here, we have determined that all of the aggravating circumstances relied upon by the trial court in imposing the upper term sentence on count three would have been found true by a jury beyond a reasonable doubt. Because the trial court did not rely on any other aggravating circumstances, there is no reasonable likelihood that a lesser sentence would have been imposed in the absence of the error.

Finally, with respect to the new presumption of section 1170, subdivision (b)(6), while we disagree with the Attorney General's assertion that the record does not support a finding that any of the factors set forth in this new subdivision was a contributing factor in the commission of the offense, we nevertheless conclude this error was also harmless. Defendant's statement to police provides some evidence that she experienced physical abuse in the past, and that while she was not abused by Caldwell, she was nevertheless afraid of him. Had the trial court credited these statements, it might have concluded this

19

past abuse contributed to her failure to prevent Caldwell from inflicting the abuse that ended her son's life. However, the trial court made quite clear that it did not "believe any of it," referring to defendant's "self-serving" statements. Moreover, in light of the trial court's other comments at the sentencing hearing, we have no difficulty concluding "the record clearly indicates the trial court would have imposed the same sentence" had the presumption of section 1170, subdivision (b)(6) existed at the time of sentencing. (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1096.)

## DISPOSITION

The judgment is affirmed.

_____
HULL, Acting P. J.

We concur:

_____
RENNER, J.

_____
KRAUSE, J.