Filed 10/30/25  P. v. Ferrel CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID MICHAEL FERREL, JR.,<br><br>Defendant and Appellant. | F088330<br><br>(Super. Ct. No. 1407606)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Robert B. Westbrook, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen, and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Hours after a heated confrontation with decedents Christopher Diaz and Mark Ochoa, Kelly Valle and Eric Arguello returned to Diaz's home with David Michael Ferrel, Jr. (appellant) and Victor Zapien. Appellant, Valle, and Zapien, were armed with firearms. During the ensuing altercation, Valle shot and killed Ochoa, and appellant and Zapien shot and killed Diaz. The gunmen also fired shots at the decedents' friend, William Harris, but he managed to escape without injury.

Appellant was tried separately from his coparticipants. A jury convicted appellant of the first degree murder of Diaz (Pen. Code, §§ 187, subd. (a), 189, subd. (a); count 1)[1] with an enhancement for the personal use of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), the first degree murder of Ochoa (§§ 187, subd. (a), 189, subd. (a); count 2), and the premeditated attempted murder of Harris (§§ 664, subd. (a), 187, subd. (a); count 5) with an enhancement for personally discharging a firearm (§ 12022.53, subd. (c)). The jury also found true multiple-murder special circumstances. (§ 190.2, subd. (a)(3)). The trial court sentenced appellant to two consecutive terms of life in prison without the possibility of parole (LWOP), plus 45 years to life.

Appellant's claims on appeal pertain solely to count 2, his conviction for the murder of Ochoa. He contends there was insufficient evidence he engaged in conduct that aided and abetted Valle, the actual killer. Relatedly, he argues the prosecutor committed misconduct during closing argument by suggesting he could be convicted as an aider and abettor based solely on his intent to kill, without evidence that he engaged in conduct that aided in the killing. We conclude the conviction was supported by substantial evidence, and that the prosecutor's arguments were not improper. We affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# FACUAL BACKGROUND

## I.     Initial Confrontation at Diaz's Residence.

In August 2009, Diaz lived with his mother at their house on Maxine Drive. Diaz and Ochoa were cousins. Harris was close friends with Diaz and lived nearby. Ryan Mayberry lived across the street from Diaz. The four friends regularly spent time together.

Arguello's parents owned a taqueria near Diaz's house. Diaz, Harris, and Mayberry frequented a T-shirt store next to the taqueria and became friends with Arguello. On August 31, 2009, Diaz, Mayberry, and Arguello had lunch at the taqueria, then went to Mayberry's house to smoke marijuana. Afterward, Diaz returned to his house, and Arguello went back to the restaurant.

At around 10:00 p.m. that evening, Diaz, Ochoa, Harris, and Mayberry were hanging out in front of Diaz's house when Arguello and Valle arrived in Arguello's burgundy truck. Harris and Mayberry did not know Valle. Mayberry testified Valle appeared drunk and had a blank stare on his face, which made him feel uneasy.

Diaz, Ochoa, Arguello, and Valle went inside of Diaz's house for a few minutes. After they exited, Ochoa and Valle stood face to face arguing and cursing. Valle asked Ochoa where he was from and if he "banged." Ochoa responded he was from "DSSN," the "Deep South Side Norteños." Valle also asked Diaz if he was actively gangbanging, and Diaz insisted he was not. Valle called Ochoa and Diaz "leyvas," a slang term for wannabes or posers.

Diaz's mother testified it appeared Ochoa and Valle were about to fight, so she stepped outside and told them there would be no fighting at her house. Valle responded, " 'Shut up, bitch.' " Arguello pushed Valle toward the truck and said, " 'Let's go.' " As they left, Valle yelled from the passenger's seat of the truck, " 'We'll be back pinta style.' " Harris explained that " 'pinta style' " is slang for "prison style."

## II.    Subsequent Confrontation and Shooting.

After the initial altercation, Mayberry went back across the street to his house, and Harris left to buy some marijuana.  Sometime later, Diaz called Mayberry and told him to come outside because Harris was on his way with the marijuana.  Meanwhile, as Harris was walking back to meet Diaz and Ochoa, he saw Arguello's truck speed past him and turn onto Maxine Drive.  Believing something was wrong, Harris began running.  The truck drove past Diaz's house, made a U-turn, and stopped a house or two away.  Diaz and Ochoa were standing in the street in front of Diaz's house.  They took their shirts off as though they were preparing for a fist fight.  Harris stood with them.

When Mayberry stepped out of his house, he saw Arguello's truck stopped with its doors open.  Four people exited the truck, and he heard "the clacking of guns."  Harris also witnessed the men exit the truck and identified the occupants.  Arguello exited from the driver's seat and did not have a weapon.  Valle exited from the front passenger's side and was holding a silver revolver.  Appellant exited from the rear passenger's side with a black revolver.  Zapien exited from the rear driver's side carrying a semiautomatic pistol with an extended magazine.  He was wearing a black bandana over his nose and mouth.

The four men ran toward Diaz, Ochoa, and Harris.  Arguello was laughing and saying, " 'Talk shit now, bitches.' "  Zapien grabbed Harris by the shirt, put the semiautomatic pistol to his head, and said, " 'Get on your knees, bitch.' "  Appellant was "bouncing around" with his revolver in hand, looking side to side, and asking, " 'Which one is Chris [Diaz]?  Which one is Chris [Diaz]?' "  Diaz moved up the driveway toward his house with his hands raised while saying, " 'Whoa, whoa, whoa.' "

At the same moment, Valle approached Ochoa in the street.  Ochoa had a gun in his hand.  Valle yelled, " 'Let's fight like men,' " and Ochoa put the gun in his waistband behind his back and began fighting.  Moments later, Valle fired a shot at Ochoa, striking

4.

him in the chest. Ochoa fell to the ground, then ran into the house next door to Mayberry's house. Mayberry and Harris never saw Ochoa fire his gun.[2]

Harris testified that when Valle shot Ochoa, Zapien turned his head toward the shot, so he pushed Zapien away and started running up Maxine Drive. As he fled, he heard multiple gunshots from several different firearms, and the sound of bullets flying past him. He ran to the end of the block and around the corner, then jumped over a fence into a backyard. He continued to hear gunfire while he hid. He did not see what happened to Diaz after he fled.

Mayberry testified that around the time Ochoa was shot, two of the men from the truck ran toward Diaz, who was still standing in his driveway. Diaz put his head down and started swinging. The two men shot Diaz, and he fell face first to the ground. Diaz suffered seven gunshot wounds and passed away on scene.

After the shooting subsided, the assailants returned to Arguello's truck. From his hiding spot, Harris watched the truck travel up Maxine Drive in his direction and stop for about 10 seconds. The truck then turned around and proceeded down Maxine Drive and left the area.

Mayberry's neighbor testified he heard several gunshots outside, then heard someone enter his house and call out for help. He followed the sounds to his hallway and found Ochoa collapsed on the floor covered in blood. Ochoa tried to hand the neighbor a firearm and asked him to "get rid of it," but the neighbor kicked it away from him and left it on the floor. An officer subsequently recovered the firearm and determined it was a Glock .40-caliber semiautomatic pistol with an extended magazine containing 30 cartridges. The magazine had been struck by a bullet, rendering it inoperative. The

---

[2] During a 2012 law enforcement interview, Mayberry stated it was possible Ochoa shot first.

5.

neighbor called 911, and emergency personnel arrived soon after. Ochoa later died from his gunshot wound.

## III. Flight from the Scene and Arrest.

Just after midnight, Modesto Police Officer Meyer received a dispatch regarding the shooting on Maxine Drive. The dispatch included a description of the suspect vehicle, which was consistent with Arguello's truck. Minutes later, Meyer observed Arguello's truck stopped at a stoplight approximately one mile east of Diaz's residence. Meyer attempted to initiate a felony traffic stop, but the truck accelerated, ran a stop sign, and turned into a residential neighborhood. Meyer followed the truck as it fled at a high rate of speed. At one point during the pursuit, two or three gunshots were fired out of the front or rear passenger's side window of the truck. Meyer saw muzzle flashes but could not see where the gun was aimed.

The truck continued at a high rate of speed, made two additional turns, then came to a stop on a residential street. The front passenger side door and both rear doors opened. The occupant on the rear passenger's side fired two or three shots as he exited the truck. As before, Officer Meyer saw muzzle flashes but could not see where the gun was aimed. Meyer could not identify the shooter. There were no strike marks on his patrol vehicle.

The three occupants fled westbound toward nearby houses. The truck continued driving a short distance then pulled into a driveway. Another officer approached the truck, found Arguello seated in the driver's seat, and arrested him.

Law enforcement set up a perimeter around the area and began searching for the remaining three suspects. Officers found appellant hiding under debris in a backyard of a residence. A black Smith & Wesson revolver and a silver Smith & Wesson revolver were found in a planter near appellant. The silver revolver contained six expended cartridge casings. The black revolver contained three expended cartridge casings and

three unexpended cartridges. Harris was shown a photograph of the revolvers and identified them as the guns appellant and Valle were carrying at the scene of the shooting.

Officers also found a Glock .40-caliber semiautomatic pistol on the roof of the residence where appellant was arrested. A 30-round extended magazine was seated in the handgun. There were 14 unexpended cartridges in the magazine.

Officers discovered Zapien hiding inside of a cardboard box in a yard several houses down from where appellant was found. Valle was also located in a nearby yard and arrested.

## IV. Subsequent Investigation.

### A. *Firearms evidence*.

Eight .40-caliber cartridge casings were recovered from the scene of the shooting on Maxine Drive. The People's firearms expert opined that four of the casings were fired by Ochoa's handgun, and four were fired by the semiautomatic handgun recovered from the roof of the residence where appellant was arrested. In addition, three .40-caliber casings were found along the path of Officer Meyer's pursuit of Arguello's truck, and another was discovered in the bed of Arguello's truck. The expert opined these casings were also fired by the semiautomatic handgun found near appellant.

Diaz's autopsy revealed he suffered seven gunshot wounds, including to the chest, shoulder, buttocks, and legs. The pathologist recovered two .38-caliber bullets from his body, and the People's firearm's expert opined the bullets were fired by the black revolver found near appellant. Two .40-caliber bullets were also recovered from Diaz's person, consistent with having been fired by the semiautomatic pistol found near appellant.

Ochoa suffered a single gunshot wound to the chest. Fragments of a .38-caliber bullet were recovered from his torso, consistent with having been fired by the silver

7.

revolver or the black revolver. The fragments were unsuitable to be identified as fired by a specific firearm.

## B. *Cell phone records.*

The People's cell phone expert examined phone records for Valle and Zapien from the night of the shooting. The records included information regarding incoming and outgoing calls, as well as the location of phones relative to nearby cell phone towers.

Valle's phone made approximately 15 calls to appellant's phone between 11:15 p.m. and 11:31 p.m. Valle's phone then made three calls to Zapien's phone between 11:36 p.m. and 11:43 p.m. Around this time, Valle's phone moved eastbound, away from Maxine drive and toward the location of Zapien's phone. At 11:43 p.m., Valle's phone and Zapien's phone connected to the same cell phone tower and tower sector, indicating they were in the same "generalized area." From 11:43 p.m. to 12:05 a.m., Valle's phone and Zapien's phone did not make or receive any calls. Officer Meyer spotted Arguello's truck traveling away from the shooting scene at 12:04 a.m.

## C. *Jail calls.*

On the morning of his arrest, appellant made several phone calls from the booking area of the county jail. At various points in the calls, the phone was passed to Zapien and Valle. The calls were recorded, and portions were admitted into evidence and played for the jury.

At the start of the first call, appellant states, "It's all bad," and "Two hot ones." In another call, he states that his ".40" is on the roof. He directs the recipient of the call to get a ladder, go to that residence, and "climb up the side." Later, appellant complains that the police found "the heaters," including his black "Smith & Wes."

## PROCEDURAL BACKGROUND

The Stanislaus County District Attorney's Office filed an information charging appellant, Arguello, Valle, and Zapien, with the murder of Diaz (§ 187, subd. (a);

count 1), the murder of Ochoa (§ 187, subd. (a); count 2), the premeditated attempted murder of Officer Meyer (§§ 664, subds. (a), (e), 187, subd. (a); counts 3 & 4), the premeditated attempted murder of Harris (§§ 664, subd. (a), 187, subd. (a); count 5), and participation in a criminal street gang (§ 186.22, subd. (a); count 9). Arguello was also charged with reckless evasion (§ 2800.2, subd. (a); count 6), and appellant and Valle were charged with being a felon in possession of a firearm (former § 12021, subd. (a)(1); counts 7 & 8).[3] As to counts 1 and 2, the information alleged multiple-murder special circumstances (§ 190.2, subd. (a)(3)) and gang-murder special circumstances (§ 190.2, subd. (a)(22)). The information also alleged various gang and firearm enhancements (§§ 186.22, subd. (b)(1), 12022.53, subds. (c), (d), (e)).

Appellant and his codefendants were tried jointly in 2012. During trial, appellant's counsel had a medical emergency, and a mistrial was declared as to appellant only. Appellant was not retried until 2023.

Prior to the instant trial, the trial court granted appellant's request to bifurcate count 9, the gang-murder special circumstances allegations and the gang enhancements.

The jury found appellant guilty on counts 1, 2, and 5, and found true the multiple-murder special-circumstances allegation, and the firearm enhancements on counts 1 and 5 (§ 12022.53, subds. (c), (d)). The jury was unable to reach a verdict on counts 3 and 4 (the premeditated attempted murder of Officer Meyer), and a mistrial was declared as to those counts. Following trial, the trial court granted the People's motion to dismiss counts 3 and 4. The People also declined to proceed to the bifurcated portion of the trial, and the court granted the People's motion to dismiss count 9, the gang-murder special circumstances allegations and the gang enhancements.

---

[3] Appellant's felon in possession of a firearm charge (count 8) was not tried to the jury and was subsequently dismissed on the People's motion.

9.

The trial court sentenced appellant as follows. On count 1, the court imposed a sentence of LWOP, plus a consecutive indeterminate term of 25 years to life for the section 12022.53, subdivision (d) enhancement. On count 2, the court sentenced appellant to a consecutive term of LWOP. On count 5, the court imposed a consecutive indeterminate term of life in prison, plus 20 years for the section 12022.53, subdivision (c) enhancement.

## DISCUSSION

### I. Appellant's Conviction for the Murder of Ochoa (Count 2) was Supported by Substantial Evidence.

The People prosecuted appellant for the murder of Ochoa on the theory that he aided and abetted Valle, the actual killer. Appellant contends this conviction must be reversed because there was no evidence he engaged in conduct that aided Valle in that killing.

### II. Applicable Legal Principles and Standard of Review.

"A person may be liable for a criminal act as an aider and abettor. Section 31 defines 'principals' in a crime to include persons who 'aid and abet in its commission, or, … have advised and encouraged its commission.' " (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069, abrogated on another ground by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) "[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) In other words, aider and abettor liability "is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) For a defendant to be convicted of first degree murder as an aider and abettor, the

prosecution must show the defendant "knowingly and intentionally assist[ed] a confederate to kill someone … [and] acted willfully, deliberately, and with premeditation." (*People v. Chiu* (2014) 59 Cal.4th 155, 167.)

The actus reus element of aiding and abetting requires a showing the defendant "by act or advice aid[ed], promot[ed], encourage[ed], or instigat[ed], the commission of the crime." (*People v. Beemon* (1984) 35 Cal.3d 547, 561; see *People v. Lee* (2003) 31 Cal.4th 613, 623; CALCRIM No. 401.) "[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission." (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) Rather "liability for aiding and abetting ' "*require[s] some affirmative action*" ' that assists or encourages the commission of the crime." (*In re K.M.* (2022) 75 Cal.App.5th 323, 329, quoting *People v. Partee* (2020) 8 Cal.5th 860, 867.) " '[T]he test is whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures.' " (*People v. Francis* (1969) 71 Cal.2d 66, 72.)

Whether a defendant aided and abetted a crime is a question of fact subject to substantial evidence review. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054; see *People v. Campbell, supra,* 25 Cal.App.4th at p. 409.) Under this standard, "we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*Tripp,* at p. 955.)

11.

**III. Substantial Evidence Supported the Jury's Finding that Appellant Engaged in Conduct that Aided in Ochoa's Murder.**

Appellant's substantial evidence challenge is limited to the actus reus element of aiding and abetting liability. Appellant does not dispute the jury's finding that he harbored the intent to kill and acted with premeditation and deliberation. Likewise, he does not contest his conviction on count 1 – the premeditated murder of Diaz with a firearm. His sole contention is that there was no evidence he committed any act that aided Valle in the murder of Ochoa.

We conclude the record clearly establishes appellant actively assisted Valle in that murder. The evidence at trial overwhelmingly supported the inference that appellant and his coparticipants planned and executed a deadly ambush aimed at killing Ochoa, Diaz, and Harris. Appellant's role in the attack, which included shooting and killing Diaz, both aided Valle in the killing of Ochoa, and advanced the group's overall objective of killing all three victims.

After Arguello and Valle left Diaz's residence and threatened to come back "pinta style," Valle called appellant and Zapien multiple times, and Arguello and Valle picked them up in Arguello's truck. Upon arrival at Diaz's residence, appellant, Valle, and Zapien exited the truck with firearms in hand. Their retaliatory motive was made clear by Arguello's taunt, " 'Talk shit now, bitches.' " Appellant, Valle, and Zapien then each targeted a specific victim. As Valle engaged Ochoa in the street and Zapien put a gun to Harris's head, appellant looked around and repeatedly asked, "Which one is Chris?" This indicated appellant and his coparticipants had planned the attack and selected specific targets. After Valle fired the fatal shot at Ochoa, Harris used the distraction to escape from Diaz and fled under a hail of gunfire. Appellant and Zapien then shot Diaz multiple times.

Given this evidence, the jury had ample basis to infer that appellant, Valle, Zapien, and Arguello planned to kill all three victims, and traveled to Diaz's residence to

12.

effectuate their intent. Appellant's agreement to join in the attack undoubtedly provided encouragement to his coparticipants and promoted their murderous conduct. By working together, they increased their potential lethality and odds of success. Once they reached Diaz's residence, appellant engaged Diaz, forcing him into the driveway and away from Ochoa and Harris. This allowed Valle to focus his efforts on killing Ochoa without fear of intervention or counterattack. And by shooting and killing Diaz, appellant aided his coparticipants by eliminating one of their three intended targets. Accordingly, we conclude substantial evidence supported appellant's conviction for the murder of Ochoa as an aider and abettor, and we reject this claim.

## IV. The Prosecutor Did Not Improperly Suggest Appellant Could be Convicted as an Aider and Abettor Without Evidence of Actus Reus.

During closing argument, the prosecutor argued that if appellant shared Valle's intent to kill Ochoa, he is "equally guilty" of Ochoa's murder. Appellant contends this erroneously suggested to the jury that he could be liable as an aider and abettor based solely on his intent, and without any evidence he took affirmative steps to aid Valle in the murder.

### A. *Background*.

The People's theory of guilt on count 2 was that appellant was guilty as an aider an abettor for the murder of Ochoa because he took part in a coordinated attack with the aim of killing Ochoa, Diaz, and Harris. The prosecutor began by observing that after the confrontation with Diaz and Ochoa, Valle called appellant and Zapien, picked them up, then returned to Diaz's residence. The prosecutor then argued that appellant, Valle, and Zapien intentionally separated the victims "so that they could manifest their intent to kill without getting any kind of reaction from them."

Later, while addressing appellant's aider and abettor liability for Ochoa's murder, the prosecutor stated:

13.

"Now, let's talk about this fact that [appellant] didn't shoot [Ochoa]. So how do you find him guilty of shooting [Ochoa] in that murder. And it's this idea right here. Principles in an offense directly and actively commit the act [constituting] the crime. Therefore the shooter himself, he's the shooter himself with regards to [Diaz] …. And then there's aiders and abettors who are under the law equally guilty. Equally guilty. Guilty for the acts of others as long as they share the intent.

"They had a plan, folks. They armed themselves. They separated [Harris], [Ochoa], and [Diaz]. Each defendant fired a gun at each victim. They fled together in the truck. They leg-bailed together….

"[¶]…[¶]

"[Valle], [appellant], and [Zapien] are all principals. They are all equally guilty for the acts of what the other ones did, because they are all shooters themselves, and they shared the intent to kill for the people they didn't shoot."

At various points during the remainder of closing argument and rebuttal, the prosecutor repeated her argument that appellant and his fellow assailants were "equally guilty" of the charged offenses because they shared the same intent. For example, while addressing Arguello's role in the murders, the prosecutor stated:

"He gets the car. He provides the car. He didn't have to bring them back. He didn't have to bring them back, but he did. Because they talked about it and had a plan, and his part of the plan was to drive them there and drive them away.

"Accomplices. Subject to prosecution for the identical offenses of all the defendants. It includes aiders and abettors. Each defendant is an accomplice to the acts of the other defendants."

Later, addressing Zapien's culpability, the prosecutor stated:

"Now, why is it important that they all have the intent to kill? Because for them to be equally guilty of all the acts committed and that they are charged with, they have to share the intent.
"So let's just take a quick look at [Zapien]. Masked his face, came back Pinta style, armed with guns. Backed [Harris] into a yard. Told him to get on his knees. Shot at him. Shot [Diaz]. We know [Zapien] had the intent to kill."

14.

Finally, during rebuttal, the prosecutor reiterated:

> "All you have to decide is whether or not [appellant] shared the same intent that [Valle] and [Zapien] and [Arguello] had …

> "[¶] … [¶]

> "He has to share the intent to kill. Share the intent to kill. That's what he has to share. That's what the instruction is going to tell you, and that's what we have proven beyond a reasonable doubt."

## V. Standard of Review.

Prosecutorial misconduct occurs when " '[a] prosecutor … uses deceptive or reprehensible methods to persuade the jury." (*People v. Parson* (2008) 44 Cal.4th 332, 359.) "When a claim of misconduct is based on the prosecutor's comments before the jury, … ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

## VI. The Prosecutor's Comments Were Not Misleading.

As we explained above, aider and abettor liability requires proof of "actus reus— conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez, supra,* 35 Cal.4th at p. 1225.) Appellant claims that the prosecutor's comments mislead the jury by implying that evidence of actus reus was not required to convict appellant of aiding and abetting the murder of Ochoa.

We are not persuaded. The prosecutor extensively argued that appellant aided his coparticipants, including Valle, by joining them in a coordinated attack aimed at killing all three victims. In this context, her comments that appellant is "equally guilty" of the murder of Ochoa if he shared Valle's intent to kill were not inaccurate or misleading. The prosecutor's argument merely highlighted that, under aiding and abetting principles, appellant may be liable for Ochoa's murder even though he did not fire the deadly shot,

so long as he aided the actual killer and acted with the intent to kill. She never stated nor suggested that appellant could be found guilty based on intent alone.

Appellant also contends the prosecutor's use of the phrase "equally guilty" was improper. He relies on criticism of a previous version of CALCRIM No. 400 (Aiding and Abetting: General Principles), which instructed that " '[a] person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it ….' " (*People v. Loza* (2012) 207 Cal.App.4th 332, 348, fn. omitted.) Addressing substantially similar language in a previous version of CALJIC No. 3.00, our high court explained that the instruction "generally stated a correct rule of law," but "could be misleading if the principals in a particular case might be guilty of different crimes and the jury interprets the instruction to preclude such a finding." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433; see *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118–1119 [reaching same conclusion with respect to CALCRIM 400], disapproved of on another ground by *People v. Banks* (2015) 61 Cal.4th 788, 809, fn. 8; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163–1165 [same].) For example, an aider and abettor to murder might be guilty of a greater or lesser crime than the direct perpetrator, depending upon the aider and abettor's intent or mental state. (*Lopez*, at p. 1118.) CALCRIM No. 400 has since been amended to remove the word " 'equally' " from this portion of the instruction. (*Loza,* at p. 348, fn. 8.)

Here, the prosecutor's use of the phrase "equally guilty" did not suggest that if the jury concluded Valle's conduct amounted to first degree murder, appellant can only be convicted of the same crime. Rather, her position was that appellant and his coparticipants were "equally guilty" because they all committed first degree murder, whether as direct perpetrators or aiders and abettors. With respect to the murder of Ochoa, she argued that appellant and Valle were "equally guilty" of first degree murder because the evidence showed that appellant aided Valle in the murder and shared his premeditated intent to kill.

In short, the prosecutor's arguments were not misleading and fell within the wide latitude afforded to prosecutor to "vigorously argue his or her case and to make fair comment upon the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) We therefore conclude prosecutorial misconduct did not occur, and this claim fails.[4]

## **DISPOSITION**

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

MEEHAN, J.

DE SANTOS, J.

---

[4] Because we reject this claim on the merits, we need not address respondent's contention that appellant forfeited the claim by failing to object below, and appellant's response that any such forfeiture was the result of ineffective assistance of counsel.