Filed 6/23/26  P. v. Benson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JIMMY LEE BENSON,<br><br>Defendant and Appellant. | C099641<br><br>(Super. Ct. Nos. STK-CR-FE-2004-0009550, SF093367B) |

Defendant Jimmy Lee Benson appeals the denial of his petition for resentencing after an evidentiary hearing pursuant to Penal Code section 1172.6, subdivision (d).[1]  He contends the evidence was insufficient to prove he is guilty of murder and attempted murder beyond a reasonable doubt.  We agree.

---

[1]    Undesignated statutory references are to the Penal Code.

Effective June 30, 2022, the Legislature renumbered former section 1170.95 as section 1172.6.  (Stats. 2022, ch. 58, § 10.)  There were no substantive changes to the statute.  Although Benson filed his petition under former section 1170.95, we cite the current section 1172.6 throughout this opinion.

1

## LEGAL AND FACTUAL BACKGROUND

We take the following summary of the facts from our nonpublished opinion in *People v. Benson* (Jan. 7, 2010, C055253) (*Benson*). The prosecution filed the opinion as an exhibit in opposition to Benson's petition, without objection.[2]

"In the fall of 2004 members of rival gangs attended a backyard birthday party. When tensions arose, the host attempted to end the party. Gunfire erupted, leaving one person dead and three injured.

"An information charged defendant with murder, attempted murder, and participation in a criminal street gang. The information also alleged the special circumstance of murder committed to benefit a criminal street gang as well as enhancements for the personal and intentional discharge of a firearm during the commission of a felony; the personal and intentional discharge of a firearm during the commission of a felony, causing great bodily injury or death; participation in an offense where a principal personally and intentionally discharged a firearm, causing great bodily injury or death; the personal use of a firearm during the commission of a felony; and the commission of an offense to benefit a street gang. (§§ 190.2, subd. (a)(22), 12022.53, subd. (c), 12022.53, subd. (d), 12022.53, subds. (d)-(e), 12022.5, subd. (a), 186.22, subd. (b)(1).)

"A jury trial followed. The prosecution pursued a theory of guilt premised on aider and abettor liability. As explained to the jury, defendant was a member of the North Side Gangster Crips gang. He and his fellow gang members felt disrespected by the presence of a rival gang in their neighborhood. They attended the party armed with guns, and the outcome was predictable. The prosecution conceded that no one likely

---

[2] On our own motion, we incorporate the appellate record in *Benson, supra*, C055253 into the record for the present appeal. In analyzing the issues, we rely upon the trial transcript, relied upon by the parties during the evidentiary hearing and on appeal. (§ 1172.6, subd. (d)(3).)

intended to kill the eventual homicide victim; the deadly shots were directed at rival gang members who were yelling gang epithets, not the innocent bystanders who got in the way. The prosecutor argued that defendant encouraged his fellow gang members through words and by participating in the gunfire; he thus was guilty as an aider and abettor.

"The evidence revealed the following:

**"The Party**

"Billy Ray Garner and his wife Tanya held a birthday party for their two teenage sons. Since the Garners had previously resided in the Bay Area, some guests from the Bay Area attended.

"The Garners' sons advertised the party with a flier circulated in Stockton, including at a mall and a local park. The fliers announced an 'ESO-EPA Party.' ESO [East Side Oakland] and EPA [East Palo Alto] are gangs and rivals of the North Side Gangster Crips. Defendant is a member of the North Side Gangster Crips. The sons also invited friends from Oakland, Palo Alto, and Stockton.

"The party took place in the Garners' backyard, complete with stereo speakers. The host manned the gate and searched guests' backpacks prior to entry. However, he frequently left his post to watch a televised boxing match.

"The party progressed without incident until a rap song was played that encouraged people to call out their hometowns or neighborhoods. Guests started yelling out towns, including East Oakland, East Palo Alto, and Stockton. Other partygoers yelled 'North Side Crip,' 'Gangster Crip,' 'NSGC,' and expletives about Stockton. The yells sparked tension among the partygoers.

"The Garners decided to end the party, turned off the music, and asked the partygoers to leave. Billy Ray Garner yelled loudly, 'The party's over. That's it. The party's over.'

"As the guests began to leave, some partygoers from the Bay Area waited across the street for rides. Other partygoers from Stockton 'crip walked' in the street a few

3

houses away.[3]  A friend of Billy Ray Garner drove up and told him one of the boys in the street had a gun.  Garner saw someone with a gun and told his wife to call the police.  The gunman was in the group gathered down the street from the Garners' home.

"Billy Ray Garner approached the man with the gun and said:  'Hey, man, you don't have to do this.  This is not that type of party.  You know.  I know what you guys are about.  These are high school kids.  You know, you don't have to do this, man.'  The person with the gun said, 'We hear you, OG.'  Garner believed 'OG' was short for 'old gangster.'  Garner later told police the man with the gun wore an Indianapolis Colts jacket.

"According to Billy Ray Garner, defendant was among the group that included the person with the gun.  Defendant said, 'Fuck that [n-word], he ain't nobody.'  Garner testified:  'At that point I knew that I was in the wrong place.  [¶] … [¶]  I started walking backwards.'

**"The Shooting**

"Billy Ray Garner took about six steps backward and then turned around.  He saw his wife's friend and told her to run.  Suddenly Garner heard 'a pop,' and gunfire hit him in the arm.  He started running and then was shot in the back.  Garner's injuries resulted in a hospital stay and follow-up surgery.

"Partygoers estimated six to nine shots were fired.  Fourteen-year-old Eric Castillo was struck in the head, foot, and stomach.  The head wound proved fatal, and Castillo was pronounced dead at the scene.

"The Garners' 14-year-old daughter was hit by a bullet in the foot.  A 17-year-old partygoer was hit in the calf and a bullet grazed his nose.

---

**3**      "Billy Ray Garner testified that 'Crip walking' is 'stuff that they be doing, throwing up gang signs, kicking their feet certain ways, going back and forth.' "

"Other bullets were fired into the Garner home. These bullets were fired from the same weapon that killed Castillo. Bullets found in the street had characteristics consistent with the bullet that killed Castillo. Officers found evidence that at least 12 rounds were fired.

**"The Aftermath**

"Officers arrived to find about 120 hostile people either walking away from the Garners' house or in their driveway. About a mile away, officers found Terrence Murray, who was wearing an Indianapolis Colts jersey. Police detained Murray and four others: David Lewis,[4] Dawayne McDonald, Tim Moppins, and Danny Williams. Gunshot residue was found on Lewis.

"In nearby bushes, officers found a .22-caliber revolver with six spent bullets in the cylinder. A prosecution expert could not determine if it had fired the bullet removed from Castillo.

**"Defendant's Arrest and Interview**

"Officers arrested defendant the day after the shooting. A gunshot residue test found no residue.

"Police Detectives Eduardo Rodgriquez and Youn Seraypheap interviewed defendant twice about the shooting. The jury heard tape recordings of both interviews.

"Initially, defendant told officers he did not have a gun and did not shoot anyone. Gradually his story began to change. Detective Rodriquez asked if defendant shot into the air, 'Maybe just to scare everybody? You're shaking your head up and down, is that yes? Well you got to say it. [¶] … [¶] How many times did you shoot? OK. You have two fingers, is it two shots?'

---

**4**     Lewis's nickname was "Tidy Whitey."

"Rodriquez asked what type of gun defendant had, and defendant stated he didn't know. Defendant also stated: '[P]eople started shooting I just started shooting up to the air. [¶] … [¶] … So they can get scared so they won't shoot me.' After the shooting defendant gave the gun to the 'homie.' Defendant later identified the gun as a '44 Desert Eagle,' which he shot '[t]wo times in the air.' Defendant denied having a revolver and said the Desert Eagle was an automatic. He also stated he picked up the two shells after the shooting and later threw them out the window while he was driving.

"Defendant told officers the .44-caliber Desert Eagle was in a friend's garage. Officers found the fully loaded gun in the garage. Defendant also told officers three members of the group he was with, Lewis, Jesse Zamora, and Andy Thompson, fired guns.

**"Dawayne McDonald**

"Dawayne McDonald, one of the men detained with Terrence Murray, exercised his Fifth Amendment right against self-incrimination and refused to testify at trial. (U.S. Const., 5th Amend.) McDonald's preliminary hearing testimony was read to the jury. During the preliminary hearing, McDonald could not recall any details of the shooting at the party or any previous statements to police.

"The prosecution then played for the jurors a videotape recording of a police interview of McDonald. McDonald told officers that partygoers from Oakland and Stockton clashed, yelling and passing out guns. McDonald stated defendant, along with Lewis, Zamora, someone named Lamont, and Andy Thompson, fired shots. Zamora fired first, shooting a .38-caliber gun. Lewis fired six shots. After the shooting, Lewis threw the revolver into the bushes.

"McDonald told officers there were six shooters and about six guns being fired during the melee. He drove around with detectives to show them where the shooters lived.

6

**"David Lewis**

"David Lewis, also detained following the shooting, was tried with defendant. Lewis testified he shot a gun the night of the party but did not fire into the crowd or aim at anybody. …

"Lewis testified he told officers he shot a gun 'in the sky' and admitted saying 'Fuck Oakland' the night of the shooting. According to Lewis: 'I wasn't shooting at nobody. [¶] … [¶] … I just shot to clear a way, man.' Anyone who said Lewis fired into the crowd was lying.

"The prosecution also played a taped interview with Lewis and the police. In the interview, Lewis said a fight broke out in the backyard between Oakland guests and Stockton guests. People started throwing gang signs. The two groups traded insults. Oakland partygoers confronted a person from Stockton and someone said, '[B]itch I'm gonna knock you out.' In response, 'some big dude said, let's take this outside again right now.'

"As the group gathered out front, people began fighting. According to Lewis, the fight lasted 10 minutes and 'We just started shooting.' Lewis saw a 'whole bunch of people … from both sides' shooting. Lewis stated: 'They was shooting at the direction. [¶] … [¶] That's when I shot up at them.' Lewis shot more than five times.

"Lewis described the gun as a chrome revolver with 'a wooden handle.' He threw away the gun when he saw the officers arrive.

**"Jesse Zamora**

"Zamora, also detained at the scene, testified he is a North Side Gangster Crip, or NSGC, as was his friend, Eddie Ortiz.[5] Zamora testified defendant was not a gang member.

---

**5** "According to Zamora's testimony, Ortiz was deceased by the time of the trial."

"Zamora learned of the party from a flier he saw at a Stockton mall. He thought it was a Bay Area party. Zamora called defendant and Ortiz and told them about the party. He and Ortiz brought guns to the party.

"Zamora and Ortiz drove to the party together; Zamora left his gun in the car but did not know if Ortiz did the same. After the party was shut down and tensions escalated, Zamora got his gun from the car and hung out with defendant, Ortiz, and Lewis.

"The group yelled 'Stockton,' and Garner approached the group and told them to leave. People began shooting as Garner walked back toward the house.

"Zamora testified he saw defendant with a '[b]ig' automatic handgun but did not see defendant fire the gun. However, Zamora did see Lewis point a gun at the crowd and fire once or twice. Zamora admitted he fired his gun twice in the air but said he only fired to get others to stop shooting.

"The jury also heard two statements Zamora gave to the police. Zamora told police he drove to the party with his mother and daughter. He went to the party and people began throwing gang signs and 'just screaming out stuff.' Zamora saw Lewis firing a gun.

"Zamora told officers defendant had a gun with a clip. During the party the gun was visible, hanging out of defendant's pocket. Defendant ignored Zamora's urging to conceal the gun. Defendant showed the gun, danced in the street, and said, '[T]his is northside.' Zamora was carrying defendant's gun when shooting broke out but gave it back to defendant when he asked for it. Zamora told police he fired twice in the air.

**"Gang Evidence**

"Gang expert Detective Michael George testified that defendant, Lewis, Zamora, and Jonathan Brooks were documented members of the North Side Gangster Crips. The ESO and the EPA were rivals of that gang.

"Defendant admitted to Detective Rodriguez that he associated with and was friends with North Side gang members. However, defendant claimed that although he

8

had belonged to the gang when he was younger, he was not currently a member. During a previous stay in juvenile hall, defendant admitted being a member of the North Side Gangster Crips.

**"Defense Case**

### "*Defendant's Testimony*

"Defendant admitted knowing North Side Gangster Crips members, such as McDonald, Ortiz, and Zamora. However, he denied belonging to the gang.

"Defendant learned of the party from some girls just prior to the party. During the party, he went out front to smoke, and when he returned to the backyard everyone was told to leave. Partygoers gathered in front of the house and began exchanging words.

"As members of the Stockton group gathered, defendant walked over to them '[t]o see what they was [*sic*] doing next, to see if there was another party that night.' As he spoke with a friend from high school about going to another party, defendant heard shots ring out behind him. Defendant did not see anyone with a gun and did not have a gun. After the shooting began, defendant ran to his car.

"Defendant testified he initially told officers he did not shoot the gun. He altered his story because he felt he had to say what the officers wanted him to say. The officers repeatedly told him it would be all right if he had fired into the air. According to defendant, 'I thought I'd be going home.'

"In addition, defendant testified that after police played a tape of Zamora stating defendant had fired a bigger gun, defendant falsely claimed that 'Booba' gave him a gun, because he knew it was a bigger gun than the one being described and 'that gun wasn't at the party that night.' Defendant told officers that Zamora used a .22-caliber weapon and Lewis used a chrome revolver because someone told him this after the shooting.

### "*David Lewis*

"Lewis testified that after the fight broke out, he fired into the air to 'clear a way.' He denied shooting Castillo. He threw the gun into some bushes.

9

**"*Other Partygoers*

"McDonald's cousin testified the party ended shortly after she arrived.  She walked around the corner when she left and then heard gunshots coming from 'right by the house.'

"Jasmine Farley also arrived shortly before the party broke up.  As she walked home, she saw two groups yelling at each other, with members of each group reaching into their waistbands as if they had guns.  After she went around the corner, she heard gunshots ring out from near the house.

"Maria Farley testified that the party broke up after people began arguing.  As she left, two groups stood on opposite sides of the street arguing, but it did not look like they were going to fight.  As she walked away, she heard shots fired.

**"*Defendant's Mother*

"Defendant's mother testified that defendant is of lower than average intelligence and has learning disabilities.  He has trouble concentrating, and when he shuts down he nods or bumps his head.

"Defendant's mother drilled into his head that when talking to people like the police, he should tell them what they wanted to hear.  Although she knew this was wrong, she did it out of fear that, because of his special needs, he would be taken from her.  Defendant's mother was also concerned about some of the people defendant was hanging out with and talked to him about them.

**"Verdict and Sentencing**

"The jury found defendant guilty of all charges and found the alleged special circumstance and enhancements to be true.  The court sentenced defendant to life in prison without the possibility of parole, plus four indeterminate terms of 25 years to life, plus a determinate term of 42 years 4 months."  (*Benson, supra*, C055253.)

**Direct Appeal**

On appeal, Benson raised several issues including challenging the admission of McDonald's videotaped statement to the police and a sentencing error. A different panel of this court agreed with the parties that the trial court harmlessly erred by permitting impeachment of McDonald's preliminary hearing testimony with the videotape of his police interview because the taped statement was not introduced into evidence at the preliminary hearing.[6]

This court also directed the trial court to amend the abstract of judgment to modify the terms appended to counts 3 and 4 for gang enhancements. (*Benson, supra*, C055253.)

**1172.6 Proceeding**

In 2019, Benson filed a petition for resentencing pursuant to section 1172.6. The trial court summarily denied the petition and Benson appealed. Finding that Benson was not ineligible for relief as a matter of law, a different panel of this court reversed the trial court's order and remanded the case for the appointment of counsel and to determine whether Benson was entitled to relief under the statute. (*People v. Benson* (Oct. 9, 2020, C089862) [nonpub. opn.].)

On remand, the court appointed counsel and set the matter for an evidentiary hearing. At the hearing, the parties relied on their respective briefs and the record of the underlying conviction. The court agreed to take judicial notice of the record of conviction, which included the reporter's transcript of the jury trial, the clerk's transcript on appeal, the jury instructions, verdicts and findings, as well as our appellate decision. The court ruled, "having read and considered the documents noted of record in this case, the Court finds beyond a reasonable doubt that the defendant was a direct aider and

---

[6]  The parties do not discuss the impact of this court's conclusion on the evidence against Benson. We need not decide its admissibility during this proceeding, however, as McDonald's statement does not inculpate Benson in any unique way.

11

abettor to the murder and attempted murders in this case. [¶] As a result, the Court finds that the Petitioner is not eligible for relief pursuant to 1172.6(3) of the Penal Code, that he could under the amended definitions of murder and attempted murder, which — of Penal Code Sections 188 and 189 as amended January 1, 2019, he could be convicted of murder and attempted murder as a direct aider and abettor. [¶] As a result, I must deny this petition."

At that same hearing, the trial court noted that it corrected Benson's sentence pursuant to this court's prior decision but that the Department of Corrections and Rehabilitation recently sent a letter in which it claimed Benson's sentence was inaccurate and invited the trial court to revisit it. Although defense counsel argued portions of Benson's sentence were incorrect, the court did not modify the sentence.

## DISCUSSION

### I.

### *Legal and Analytical Framework*

As relevant here, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) eliminated the natural and probable consequences doctrine as it relates to murder to ensure a person's sentence is commensurate with his or her criminal culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843, superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.) Specifically, it amended section 188 by adding a requirement that, except as stated in section 189, subdivision (e), all principals to murder must act with express or implied malice to be convicted of that crime. (§ 188, subd. (a)(3).) Senate Bill No. 775 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 551, § 2) extended relief to defendants convicted of attempted murder, but only if their convictions were "based on the natural and probable consequences doctrine." (*People v. Coley* (2022) 77 Cal.App.5th 539, 548; § 1172.6, subd. (a).)

Senate Bill 1437 also created a procedural mechanism for defendants with eligible murder convictions to seek retroactive relief under the amended law. (*People v. Strong*

12

(2022) 13 Cal.5th 698, 708.) Under section 1172.6, if a petitioner makes a prima facie showing of entitlement to relief, the trial court must issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing. (§ 1172.6, subd. (d)(3).) At that hearing, the court sits as an independent fact finder and the prosecution has the burden of proving beyond a reasonable doubt that the defendant is guilty of murder or attempted murder under the amended law. (§ 1172.6, subd. (d)(3); *People v. Lewis* (2021) 11 Cal.5th 952, 960.) The parties may offer new or additional evidence at the hearing. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 743.)

## II.
### *Aiding and Abetting*

Several people fired a weapon on the night of the party; the prosecution never alleged Benson was the actual killer. The jury was instructed that Benson "has been prosecuted for first degree murder under the theory of aider and abettor only" and that to be guilty of first degree murder, the jury had to find that the defendant intended to kill. Thus, the parties agree that direct aiding and abetting is the relevant theory of liability for Benson's murder and attempted murder convictions.

" '[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another [e.g., murder] if the accomplice aids the commission of that offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends." ' " (*People v. Curiel* (2023) 15 Cal.5th 433, 463.) The defendant must not only know the direct perpetrator's intent to commit murder, but he or she must share that intent. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) And, " 'aiding and abetting the commission of a crime *require*[*s*] *some affirmative action*.' " (*People v. Partee* (2020) 8 Cal.5th 860, 868.) "The word 'aids' … refers only to overt or affirmative forms of assistance." (*Ibid*.)

## A.  Trial Court Ruling and Standard of Review

The trial court did not make any findings of fact or credibility determinations when it denied Benson's petition for resentencing pursuant to section 1172.6.  The court simply found beyond a reasonable doubt that "the defendant was a direct aider and abettor and as a result is … not eligible for relief."

We review a trial court's denial of a section 1172.6 petition for substantial evidence.  (*People v. Emanuel* (2025) 17 Cal.5th 867, 885.)  "Under this standard, 'we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact" ' " ' " could find beyond a reasonable doubt that Benson was a direct aider and abettor in the murder and attempted murders.  (*Ibid.*)

In reviewing the record, we are guided, but not limited, by the parties' identification of the relevant facts.  We have paid particular attention to the factual assertions made by the prosecutor at the evidentiary hearing where the prosecution had the burden to prove, beyond a reasonable doubt, that Benson is guilty of murder or attempted murder under the current law.  In contending the evidence overwhelmingly shows that Benson "encouraged and facilitated by his words and gunfire in accomplishing the murder and attempted murders," the prosecutor identified certain facts.  We note that on appeal the People rely on the prosecutor's factual assertions, presenting few additional facts.  Benson contends the only two pieces of evidence against him — his dismissive comment to Garner and firing two shots in the air — were insufficient to render him ineligible for relief.  All these facts and more are discussed in detail below.  We do not make any credibility determinations or resolve any conflicts in the evidence.

## B.  Murder

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  Malice may be express or implied.  (§ 188, subd. (a).)  The difference

14

between express malice and implied malice is the former requires an intent to kill but the latter does not. (*People v. Soto* (2018) 4 Cal.5th 968, 976.)

We initially address the impact of the gang-murder special-circumstances finding. With respect to the murder of Castillo, the jury was instructed on — and found true — the special circumstances of killing by a street gang. (§ 190.2, subd. (a)(22); CALCRIM No. 736) This expressly required the jury to find that Benson "intended to kill." (See *People v. Hin* (2025) 17 Cal.5th 401, 454 [where a jury's true finding on the gang-murder special circumstance necessarily includes a finding that the accomplice intended to kill the murder victim].) The People mention this special circumstance finding in passing and Benson merely devotes a footnote in his reply brief to assert it is "utterly irrelevant" because the trial court acts as an independent fact finder.[7]

Supreme Court precedent suggests that a gang-murder special-circumstance finding is not irrelevant at this stage but, under the circumstances here, does not necessarily settle the argument. In finding the special circumstance allegation true, the jury necessarily decided one aspect of the intent element; Benson possessed the intent to kill. (See *People v. Curiel, supra*, 15 Cal.5th at p. 453 ["a relevant jury finding is generally preclusive in section 1172.6 proceedings"].) "Although intent to kill is certainly blameworthy, it is insufficient standing alone to render a person culpable for another's acts. The aider and abettor must know the direct perpetrator intends to commit the murder … and intend to aid the direct perpetrator in its commission. It is this mental

---

[7] We disagree that a trial court presiding over an evidentiary hearing may override a jury finding. Nothing in section 1172.6 suggests it was intended to provide redress for allegedly erroneous prior factfinding. (See *People v. Farfan* (2021) 71 Cal.App.5th 942, 947; see also *People v. Strong, supra*, 13 Cal.5th at p. 715 [the Legislature did not intend "to permit wholesale relitigation of findings supporting murder convictions in the context of section 1172.6 resentencing"].)

15

relationship to the perpetrator's acts that confers liability on the aider and abettor." (*Id*. at p. 468.)

As viewed in the light most favorable to supporting the trial court's findings, we find no evidence that Benson knew the direct perpetrator's intent to commit the murder.

Initially, Benson had no knowledge of the party and had no intention of going. There was no plan for all the North Side Gangster Crips to meet at the party; some members went and some did not.[8] It appears everyone who attended, including Benson, was well aware that rival gang members were present. Benson knew that Craig Roy (one of the attempted murder victims), in particular, was a member of a rival gang. However, there was no evidence that any of the North Side Gangster Crips purposefully went to the party to kill anyone or cause trouble in general.

Partygoers appeared to be having a good time until a song came on prompting people to yell out their neighborhoods. At that point, the mood changed and the party ended. At least one person yelled, "Fuck Stockton" and at least Lewis yelled, "Fuck Oakland."

Zamora walked out of the front gate and crossed the street. Zamora said he was leaving the party, alone, and ran into Lewis who told him, "we shoot" or "I'll shoot." There is no indication Benson was present for that conversation. However, a group consisting of Benson, Ortiz, Thompson, McDonald, Zamora, and Lewis formed across the street and two houses down from the Garners' home. Benson did not know Lewis, but he was friends with Zamora and Thompson; they were all members of the North Side Gangster Crips.

Some partygoers from Oakland were in front by the driveway. A different group of people were in the middle of the street, "Crip walking." Zamora testified that he

---

[8]     The gang expert testified that he believed only five to 10 of the 154 North Side Gangster Crip members attended the party.

thought it looked like partygoers were armed with guns, so he retrieved his own gun from his car and returned to his friends. However, he also previously told law enforcement that Benson handed him a black .22-caliber revolver.[9] At some point, Zamora spoke to Ortiz and Lewis about leaving but Lewis called him stupid and said, "we need to do it now. We ain't leaving." There is no evidence Benson was present for this conversation. From the time Zamora returned with his gun to when shots were fired, Zamora did not see Benson speak with anyone in the group. At some point, Benson left the group and stood off to the side by himself.

Garner asked the group to leave. The person with the gun said, "We hear you OG" then turned and walked into the crowd of about 10 to 12 people to stand by Benson. Garner then heard Benson say, "Fuck that [n-word], he ain't nobody." Garner retreated and gunshots erupted.

Zamora told officers he saw Lewis walk out in the middle of the street and start shooting. He also testified he saw Lewis pointing his revolver at the crowd. Zamora turned and saw Benson with a big gun in his hand.[10] Lewis fired a .22-caliber handgun, Thompson fired a .38-special handgun, and Zamora fired a .22-caliber handgun. At some point, Benson fired a .44-caliber Desert Eagle twice in the air. It is possible that as many as 12 different bullets were fired.

Castillo died from multiple gunshots. He suffered a fatal gunshot wound to his head from a .38-caliber gun and a potentially fatal gunshot wound to the abdomen from a .22-caliber gun.

---

[9]     There is conflicting evidence as to how members of Benson's group were armed. In another version, one of Lewis's friends handed Zamora a gun.

[10]     In another version, Zamora told officers that Benson's gun was hanging out of his pocket as he danced in the street and said, "this is northside," and Zamora took Benson's gun from him. In that version, Zamora further explained, he was carrying Benson's gun when the shooting started.

If any of Benson's cohorts formed an intent to kill from the time the party ended to when the first shot was fired, we see no indication that Benson knew of it. At oral argument, the People contended that Benson's statement, "Fuck that [n-word], he ain't nobody," was as much to his cohorts as to Garner and thus we should interpret Benson's statement as one of encouragement for the shooting. This is consistent with the People's argument in their brief, which points to that statement as part of the "wealth of evidence" supporting Benson's conviction for murder as an aider and abettor. Yet the People fail to explain how Benson's statement demonstrates his own intent to kill or even knowledge that his cohorts had such an intent. We disagree that we may read any such intent or knowledge into his statement based on the context of the events that night where, as we discuss, there was no evidence of a common plan or shared intent. Benson arrived separately from his cohorts and it appeared all had a good time at the party until it was shut down by Garner. Although Benson's cohorts were armed, the only person talking about using his firearm was Lewis. But there is no evidence that Benson was present during any of Lewis's comments and Benson did not even know Lewis.

Nor is there any evidence that once the shooting began, Benson would have discerned a cohort's intent to kill from any of the actions of his group. We acknowledge that in many cases intent may be inferred from a person's acts and the circumstances of the crime. (*People v. Smith* (2005) 37 Cal.4th 733, 741.) In particular, "[t]he act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill" (*People v. Houston* (2012) 54 Cal.4th 1186, 1218), even if the defendant shoots "without advance consideration" (*People v. Arias* (1996) 13 Cal.4th 92, 162). Here, someone other than Benson fired the first shot and most of his group, if not all, fired their weapon soon thereafter. But there is no indication that Benson's group was within close range of the people in front of the Garners' home when the shooting began. Indeed, Benson and his group were across the street and two houses down from the Garners'

18

home.  Benson's knowledge that the gunfire was happening from that distance, without more, does not translate to knowledge of his cohort's intent to kill.

The mere fact of gang membership does not provide the missing knowledge link. The gang expert testified that by shooting at people who were yelling "Fuck Stockton" or "Fuck North Side," a member of the North Side Gangster Crips could elevate themselves in the gang.  Shooting at people (especially at the distance discussed above) is reprehensible but is not always the same as shooting at people with intent to kill.  And we cannot presume that because members of Benson's group belonged to the same gang, they must have known each other's intent.  Indeed, the law does not recognize a rule of guilt by association; "we insist on proof of a defendant's knowledge of, and specific intent to further, the group's unlawful ends."  (*People v. Ware* (2022) 14 Cal.5th 151, 165.)

Finally, we glean no evidentiary value from Benson's possession of the rap lyrics about carrying guns, shooting, and killing that officers found under his bed.  The handwritten lyrics mention guns, being armed, "rid[ing] with my [n-word] till he face time," "I can't cry every [] it's a homicide," "it's a hood thang, mount up," "if you gonna … be ah king pen you gotta be a soldier" and "if [n-words] front I put 'em in ah hurt with the hole in their head about the size of the planet earth."  But, it was undisputed that the lyrics were written by John Fletcher, a man who used to come to the house to make music with Benson's brother.  Second, even if Benson's possession of the lyrics is considered an adoption of the words as his own, the lyrics do not mention this particular shooting such that there is any connection between the lyrics and Benson's participation in the shooting.  Third, even if the lyrics do reflect Benson's own mental state when he participated in the shooting, the lyrics say nothing about Benson's knowledge of his cohort's intent, as required for aiding and abetting.

Without knowledge of his cohort's intent to kill, any of Benson's subsequent acts cannot constitute the actions necessary to establish aider and abettor liability.  Thus, even if Benson handed Zamora a .22-caliber revolver and fired a gun himself, those actions

19

certainly demonstrate poor judgment but not liability for murder. Indeed, we agree with the prosecutor at trial that Benson's liability suited a natural and probable consequences theory. As argued by the trial prosecutor, by firing his gun Benson committed an assault with a firearm or negligent discharge of a firearm with his fellow gang members, the natural and probable consequence of which is murder. There is evidence to support the theory that Benson and his cohorts fired their guns in a way that would either result in the application of force to a person or was grossly negligent because it created a high risk of death or great bodily injury. *If the natural and probable consequence theory for murder were still viable*, the facts here would serve as a textbook example of liability under that theory. (See, e.g., *People v. Covarrubias* (2016) 1 Cal.5th 838, 901 [under the natural and probable consequences doctrine, " '[a]n aider and abettor is guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime' "].) They do not, however, establish knowledge of a cohort's intent to commit murder and actions to help achieve that goal.

We conclude the facts do not constitute substantial evidence that Benson knew the killer's intent to commit murder and acted with the goal of aiding and abetting the killing. Accordingly, Benson's murder conviction cannot stand.

## C. Attempted Murder

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) In contrast to murder, attempted murder requires express malice; implied malice will not support attempted murder. (*People v. Mumin* (2023) 15 Cal.5th 176, 190; *Canizales*, at p. 602.)

Here, the jury was instructed on the natural and probable consequences, aiding and abetting, and kill zone theories of liability for the attempted murders. Because Senate

20

Bill 1437 eliminated the former theory (*People v. Reyes* (2023) 14 Cal.5th 981, 990), to support Benson's convictions, the prosecution had to prove either that Benson (1) separately harbored an intent to kill Garner, Grigsby, and Roy, or (2) harbored a concurrent intent to kill them because they were within the kill zone intentionally created to ensure the murder of the primary target. (See *People v. Canizales, supra*, 7 Cal.5th at p. 603 [kill zone theory is an alternative means of establishing intent to kill].) And, " '[t]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing — which means that the person guilty of attempted murder as an aider and abettor must intend to kill.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)

Unlike the murder verdict, the jury did not return any special finding that Benson intended to kill Garner, Grigsby, and Roy that night and thus we have no insight as to the jury's conclusion as to Benson's mental state in relation to those charges. (See *People v. Hi, supra*, 17 Cal.5th at p. 454 [where a jury's true finding on the gang-murder special circumstance necessarily includes a finding that the accomplice intended to kill the murder victim, the record did not establish beyond a reasonable doubt that defendant also intended to kill attempted murder victims].) We conclude no substantial evidence supports the finding that Benson had knowledge of his cohort's specific or concurrent intent to kill and intended to help him/them do so.

First, Benson's comment to Garner, while disrespectful, was not accompanied by any evidence of a threat, and the comment itself does not suggest he or anyone harbored a specific intent to kill Garner. And although there was evidence that Benson knew Roy to be a rival gang member, there was no evidence of any animosity between Roy and Benson or any of Benson's cohorts and, aside from general gang rivalry, there was no evidence that anyone in Benson's group felt disrespected by Roy in particular that night or that the North Side Gangster Crips were at the party to settle a score by killing Roy.

21

And there appears to be absolutely no connection between Grigsby and Benson or his cohorts, much less any problems that might give rise to an intent to kill her. Finally, even assuming one of Benson's cohorts attempted to create a kill zone around a primary target such that the cohort had concurrent intent to kill Garner, Grigsby, and Roy, there is no basis for a finding that Benson was aware of such an intent and intended to assist his cohort(s) in achieving that goal, as necessary for his conviction as an aider and abettor. (*People v. Curiel, supra*, 15 Cal.5th at p. 463.) The record simply reflects no shared intent to kill Garner, Grigsby, or Roy or to kill everyone in order to ensure the primary target's death.

### III.
### *Sentencing*

Benson contends the trial court abused its discretion in refusing to order a new sentencing hearing in light of the letter from the Department of Corrections and Rehabilitation and noted problems with his sentence. In light of our conclusion that insufficient evidence supports Benson's murder and attempted murder convictions, we need not address these claims as the matter will be remanded for resentencing.

**DISPOSITION**

We reverse the trial court's order denying Benson's petition for resentencing under section 1172.6.  The case is remanded to the trial court to vacate Benson's murder and attempted murder convictions and resentence him accordingly.

/s/
EARL, P. J.

We concur:

/s/
MESIWALA, J.

/s/
WISEMAN, J.*

\*     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.